**VANDERBILT UNIVERSITY,**
**Plaintiff–Appellee,**

v.

**Gerry DiNARDO, Defendant–Appellant.**

**No. 97–5935.**

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 27, 1998.

Decided April 14, 1999.

Thomas J. Piskorski (argued and briefed), David E. Metz (briefed), Sey-

farth, Shaw, Fairweather & Geraldson, Chicago, Illinois, for Defendant–Appellant.

William N. Ozier (argued and briefed), J. Davidson French (briefed), Bass, Berry & Sims, Nashville, Tennessee, for Plaintiff–Appellee.

Before: NELSON, CLAY, and GIBSON, Circuit Judges.*

GIBSON, J., delivered the opinion of the court. NELSON (pp. 760–761) and CLAY (pp. 761–762), JJ., delivered separate opinions concurring in part and dissenting in part.

GIBSON, Circuit Judge.

Gerry DiNardo resigned as Vanderbilt's head football coach to become the head football coach for Louisiana State University. As a result, Vanderbilt University brought this breach of contract action. The district court entered summary judgment for Vanderbilt, awarding $281,886.43 pursuant to a damage provision in DiNardo's employment contract with Vanderbilt. DiNardo appeals, arguing that the district court erred in concluding: (1) that the contract provision was an enforceable liquidated damage provision and not an unlawful penalty under Tennessee law; (2) that Vanderbilt did not waive its right to liquidated damages; (3) that the Addendum to the contract was enforceable; and (4) that the Addendum applied to the damage provision of the original contract. DiNardo also argues that there are disputed issues of material fact precluding summary judgment. We affirm the district court's ruling that the employment contract contained an enforceable liquidated damage provision and the award of liquidated damages under the original contract. We conclude, however, that there are genuine issues of material fact as to whether the Addendum was enforceable. We therefore reverse the judgment awarding liquidated damages under the Addendum and remand the case to the district court.[1]

On December 3, 1990, Vanderbilt and DiNardo executed an employment contract hiring DiNardo to be Vanderbilt's head football coach. Section one of the contract provided:

> The University hereby agrees to hire Mr. DiNardo for a period of five (5) years from the date hereof with Mr. DiNardo's assurance that he will serve the entire term of this Contract, a long-term commitment by Mr. DiNardo being important to the University's desire for a stable intercollegiate football program....

The contract also contained reciprocal liquidated damage provisions. Vanderbilt agreed to pay DiNardo his remaining salary should Vanderbilt replace him as football coach, and DiNardo agreed to reimburse Vanderbilt should he leave before his contract expired. Section eight of the contract stated:

> Mr. DiNardo recognizes that his promise to work for the University for the entire term of this 5–year Contract is of the essence of this Contract to the University. Mr. DiNardo also recognizes that the University is making a highly valuable investment in his continued employment by entering into this Contract and its investment would be lost were he to resign or otherwise terminate his employment as Head Football Coach with the University prior to the expiration of this Contract. Accordingly, Mr. DiNardo agrees that in the event he resigns or otherwise terminates his employment as Head Football Coach (as opposed to his resignation or termination from another position at the University to which he may have been reassigned), prior to the expiration of this Contract, and is em-

---

* The Honorable John R. Gibson, Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

1. Judge Clay's separate opinion concurs in Parts I and II and dissents from Part III of the court's opinion. Judge Nelson's separate opinion concurs in Parts II and III and dissents from Part I of the court's opinion.

ployed or performing services for a person or institution other than the University, he will pay to the University as liquidated damages an amount equal to his Base Salary, less amounts that would otherwise be deducted or withheld from his Base Salary for income and social security tax purposes, multiplied by the number of years (or portion(s) thereof) remaining on the Contract.

During contract negotiations, section eight was modified at DiNardo's request so that damages would be calculated based on net, rather than gross, salary.

Vanderbilt initially set DiNardo's salary at $100,000 per year. DiNardo received salary increases in 1992, 1993, and 1994.

On August 14, 1994, Paul Hoolahan, Vanderbilt's Athletic Director, went to Bell Buckle, Tennessee, where the football team was practicing, to talk to DiNardo about a contract extension. (DiNardo's original contract would expire on January 5, 1996). Hoolahan offered DiNardo a two-year contract extension. DiNardo told Hoolahan that he wanted to extend his contract, but that he also wanted to discuss the extension with Larry DiNardo, his brother and attorney.

Hoolahan telephoned John Callison, Deputy General Counsel for Vanderbilt, and asked him to prepare a contract extension. Callison drafted an addendum to the original employment contract which provided for a two-year extension of the original contract, specifying a termination date of January 5, 1998. Vanderbilt's Chancellor, Joe B. Wyatt, and Hoolahan signed the Addendum.

On August 17, Hoolahan returned to Bell Buckle with the Addendum. He took it to DiNardo at the practice field where they met in Hoolahan's car. DiNardo stated that Hoolahan did not present him with the complete two-page addendum, but only the second page, which was the signature page. DiNardo asked, "what am I signing?" Hoolahan explained to DiNardo, "[i]t means that your contract as it pres-

ently exists will be extended for two years with everything else remaining exactly the same as it existed in the present contract." Before DiNardo signed the Addendum, he told Hoolahan, "Larry needs to see a copy before this thing is finalized." Hoolahan agreed, and DiNardo signed the document. DiNardo explained that he agreed to sign the document because he thought the extension was the "best thing" for the football program and that he "knew ultimately, Larry would look at it, and before it would become finalized he would approve it." Hoolahan took the signed document without giving DiNardo a copy.

On August 16, Larry DiNardo had a telephone conversation with Callison. They briefly talked about the contract extension, discussing a salary increase. Larry DiNardo testified that as of that date he did not know that Gerry DiNardo had signed the Addendum, or even that one yet existed.

DiNardo stated publicly that he was "excited" about the extension of his contract, and there was an article in the August 20, 1994, newspaper, *The Tennessean,* reporting that DiNardo's contract had been extended by two years.

On August 25, 1994, Callison faxed to Larry DiNardo "a copy of the draft Addendum to Gerry's contract." Callison wrote on the fax transmittal sheet: "[l]et me know if you have any questions." The copy sent was unsigned. Callison and Larry DiNardo had several telephone conversations in late August and September, primarily discussing the television and radio contract. Callison testified that he did not recall discussing the Addendum, explaining: "[t]he hot issue . . . was the radio and television contract." On September 27, Callison sent a fax to Larry DiNardo concerning the television and radio contract, and also added: "I would like your comments on the contract extension." Larry DiNardo testified that he neither participated in the drafting nor suggested any changes to the Addendum.

In November 1994, Louisiana State University contacted Vanderbilt in hopes of speaking with DiNardo about becoming the head football coach for L.S.U. Hoolahan gave DiNardo permission to speak to L.S.U. about the position. On December 12, 1994, DiNardo announced that he was accepting the L.S.U. position.

Vanderbilt sent a demand letter to DiNardo seeking payment of liquidated damages under section eight of the contract. Vanderbilt believed that DiNardo was liable for three years of his net salary: one year under the original contract and two years under the Addendum. DiNardo did not respond to Vanderbilt's demand for payment.

Vanderbilt brought this action against DiNardo for breach of contract. DiNardo removed the action to federal court, and both parties filed motions for summary judgment. The district court held that section eight was an enforceable liquidated damages provision, not an unlawful penalty, and that the damages provided under section eight were reasonable. *Vanderbilt University v. DiNardo*, 974 F.Supp. 638, 643 (M.D.Tenn.1997). The court held that Vanderbilt did not waive its contractual rights under section eight when it granted DiNardo permission to talk to L.S.U. and that the Addendum was enforceable and extended the contract for two years. *Id.* at 643–45. The court entered judgment against DiNardo for $281,886.43. *Id.* at 645. DiNardo appeals.

## I.

■ DiNardo first claims that section eight of the contract is an unenforceable penalty under Tennessee law. DiNardo argues that the provision is not a liquidated damage provision but a "thinly disguised, overly broad non-compete provision," unenforceable under Tennessee law.

We review the district court's summary judgment de novo, using the same standard as used by the district court. *See Birgel v. Bd. of Comm'rs*, 125 F.3d 948,

950 (6th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1038, 140 L.Ed.2d 104 (1998). We view the evidence in the light most favorable to the non-moving party to determine whether there is a genuine issue as to any material fact. *See id.* Summary judgment is proper if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

■ Contracting parties may agree to the payment of liquidated damages in the event of a breach. *See Beasley v. Horrell*, 864 S.W.2d 45, 48 (Tenn.Ct.App.1993). The term "liquidated damages" refers to an amount determined by the parties to be just compensation for damages should a breach occur. *See id.* Courts will not enforce such a provision, however, if the stipulated amount constitutes a penalty. *See id.* A penalty is designed to coerce performance by punishing default. *See id.* In Tennessee, a provision will be considered one for liquidated damages, rather than a penalty, if it is reasonable in relation to the anticipated damages for breach, measured prospectively at the time the contract was entered into, and not grossly disproportionate to the actual damages. *See Beasley*, 864 S.W.2d at 48; *Kimbrough & Co. v. Schmitt*, 939 S.W.2d 105, 108 (Tenn.Ct.App.1996). When these conditions are met, particularly the first, the parties probably intended the provision to be for liquidated damages. However, any doubt as to the character of the contract provision will be resolved in favor of finding it a penalty. *See Beasley*, 864 S.W.2d at 48.

The district court held that the use of a formula based on DiNardo's salary to calculate liquidated damages was reasonable "given the nature of the unquantifiable damages in the case." 974 F.Supp. at 642. The court held that parties to a contract may include consequential damages and even damages not usually awarded by law in a liquidated damage provision provided

.that they were contemplated by the parties. *Id.* at 643. The court explained:

> The potential damage to [Vanderbilt] extends far beyond the cost of merely hiring a new head football coach. It is this uncertain potentiality that the parties sought to address by providing for a sum certain to apply towards anticipated expenses and losses. It is impossible to estimate how the loss of a head football coach will affect alumni relations, public support, football ticket sales, contributions, etc. ... As such, to require a precise formula for calculating damages resulting from the breach of contract by a college head football coach would be tantamount to barring the parties from stipulating to liquidated damages evidence in advance.

*Id.* at 642.

DiNardo contends that there is no evidence that the parties contemplated that the potential damage from DiNardo's resignation would go beyond the cost of hiring a replacement coach. He argues that his salary has no relationship to Vanderbilt's damages and that the liquidated damage amount is unreasonable and shows that the parties did not intend the provision to be for liquidated damages.

DiNardo's theory of the parties' intent, however, does not square with the record. The contract language establishes that Vanderbilt wanted the five-year contract because "a long-term commitment" by DiNardo was "important to the University's desire for a stable intercollegiate football program," and that this commitment was of "essence" to the contract. Vanderbilt offered the two-year contract extension to DiNardo well over a year before his original contract expired. Both parties understood that the extension was to provide stability to the program, which helped in recruiting players and retaining assistant coaches. Thus, undisputed evidence, and reasonable inferences therefrom, establish that both parties understood and agreed that DiNardo's resignation would result in Vanderbilt suffering damage beyond the cost of hiring a replacement coach.

■ This evidence also refutes DiNardo's argument that the district court erred in presuming that DiNardo's resignation would necessarily cause damage to the University. That the University may actually benefit from a coaching change (as DiNardo suggests) matters little, as we measure the reasonableness of the liquidated damage provision at the time the parties entered the contract, not when the breach occurred, *Kimbrough & Co.*, 939 S.W.2d at 108, and we hardly think the parties entered the contract anticipating that DiNardo's resignation would benefit Vanderbilt.

The stipulated damage amount is reasonable in relation to the amount of damages that could be expected to result from the breach. As we stated, the parties understood that Vanderbilt would suffer damage should DiNardo prematurely terminate his contract, and that these actual damages would be difficult to measure. *See Kimbrough & Co.*, 939 S.W.2d at 108.

Our conclusion is consistent with a decision by the Tennessee Court of Appeals in *Smith v. American General Corporation*, No 87–79–II, 1987 WL 15144 (Tenn.Ct. App. Aug.5, 1987). In that case, an individual sued his former employer for breach of an employment contract. *Id.* at *1. The employee had a three-year contract, and the contract provided for a single lump sum payment of all remaining compensation in the event of a breach by the employer. *Id.* at *1–2. When the employer reduced the employee's duties, he quit, and sued seeking to enforce the liquidated damage provision. The employer argued the provision was a penalty, and that the employee should only be able to recover his total salary under the contract reduced by the employee's earnings in his new job. The Tennessee court rejected these arguments, concluding that even though the usual measure of damage is the difference between an employee's old and new salaries, here, the parties reasonably

contemplated "special damage," including the intangible damage to the employee's prestige and career. *Id.* at *6. The court found that the parties expressly recognized the importance to the employee of the continuation of his employment, and it was "clearly within the contemplation of the parties that, if [the employee] should not be retained in his position ... he would suffer unliquidated damages which would be difficult of proof." *Id.* at *7.

Our reasoning follows that of *Smith.* Vanderbilt hired DiNardo for a unique and specialized position, and the parties understood that the amount of damages could not be easily ascertained should a breach occur. Contrary to DiNardo's suggestion, Vanderbilt did not need to undertake an analysis to determine actual damages, and using the number of years left on the contract multiplied by the salary per year was a reasonable way to calculate damages considering the difficulty of ascertaining damages with certainty. *See Kimbrough & Co.*, 939 S.W.2d at 108. The fact that liquidated damages declined each year DiNardo remained under contract, is directly tied to the parties' express understanding of the importance of a long-term commitment from DiNardo. Furthermore, the liquidated damages provision was reciprocal and the result of negotiations between two parties, each of whom was represented by counsel.

We also reject DiNardo's argument that a question of fact remains as to whether the parties intended section eight to be a "reasonable estimate" of damages. The liquidated damages are in line with Vanderbilt's estimate of its actual damages. *See Kimbrough & Co.*, 939 S.W.2d at 108–09. Vanderbilt presented evidence that it incurred expenses associated with recruiting a new head coach of $27,000.00; moving expenses for the new coaching staff of

$86,840; and a compensation difference between the coaching staffs of $184,311. The stipulated damages clause is reasonable under the circumstances, and we affirm the district court's conclusion that the liquidated damages clause is enforceable under Tennessee law.

## II.

■ DiNardo next argues that Vanderbilt waived its right to liquidated damages when it granted DiNardo permission to discuss the coaching position with L.S.U. Under Tennessee law, a party may not recover liquidated damages when it is responsible for or has contributed to the delay or nonperformance alleged as the breach. *See V.L. Nicholson Co. v. Transcon Inv. and Fin. Ltd., Inc.*, 595 S.W.2d 474, 484 (Tenn.1980).

Vanderbilt did not waive its rights under section eight of the contract by giving DiNardo permission to pursue the L.S.U. position. *See Chattem, Inc. v. Provident Life & Accident Ins. Co.*, 676 S.W.2d 953, 955 (Tenn.1984) (waiver is the intentional, voluntary relinquishment of a known right). First, Hoolahan's permission was quite circumscribed. Hoolahan gave DiNardo permission to talk to L.S.U. about their coaching position; he did not authorize DiNardo to terminate his contract with Vanderbilt. Second, the employment contract required DiNardo to ask Vanderbilt's athletic director for permission to speak with another school about a coaching position,[2] and Hoolahan testified that granting a coach permission to talk to another school about a position was a "professional courtesy." Thus, the parties certainly contemplated that DiNardo could explore other coaching positions, and indeed even leave Vanderbilt, subject to the terms of the liquidated damage provision.

---

2. Section nine provided:

The parties agree that should another coaching opportunity be presented to Mr. DiNardo or should Mr. DiNardo be interested in another coaching position during the term of this Contract, he must notify the

University's Director of Athletics of such opportunity or interest and written permission must be given to Mr. DiNardo by the Director of Athletics before any discussions can be held by Mr. DiNardo with the anticipated coaching-position principal.

See *Park Place Ctr. Enterprises, Inc. v. Park Place Mall Assoc.*, 836 S.W.2d 113, 116 (Tenn.Ct.App.1992) ("All provisions of a contract should be construed as in harmony with each other, if such construction can be reasonably made ..."). Allowing DiNardo to talk to another school did not relinquish Vanderbilt's right to liquidated damages.

## III.

DiNardo claims that the Addendum did not become a binding contract, and therefore, he is only liable for the one year remaining on the original contract, not the three years held by the district court.

### A.

DiNardo argues that the Addendum did not extend section eight, or that there is at least a question of fact as to whether the Addendum extended section eight.

Under Tennessee law, the rights and obligations of contracting parties are governed by their written agreements. *Hillsboro Plaza Enterprises v. Moon*, 860 S.W.2d 45, 47 (Tenn.Ct.App. 1993). When the agreement is unambiguous, the meaning is a question of law, and we should enforce the agreement according to its plain terms. *Richland Country Club, Inc. v. CRC Equities, Inc.*, 832 S.W.2d 554, 557 (Tenn.Ct.App.1991).

DiNardo argues that the original employment contract explicitly provides that section eight is limited to "the entire term of this five-year contract," and the plain, unambiguous language of the Addendum did not extend section eight. He points out that the Addendum did not change the effective date in section eight, unlike other sections in the contract.

The plain and unambiguous language of the Addendum read in its entirety, however, provides for the wholesale extension of the entire contract. Certain sections were expressly amended to change the original contract expiration date of January 5, 1996, to January 5, 1998, because those sections of the original contract contained the precise expiration date of January 5, 1996. The district court did not err in concluding that the contract language extended all terms of the original contract.

### B.

DiNardo also claims that the Addendum never became a binding contract because Larry DiNardo never expressly approved its terms.[3] DiNardo contends that, at the very least, a question of fact exists as to whether the two-year Addendum is an enforceable contract.

The district court concluded that the Addendum was enforceable as a matter of law because the parties acted as though the contract had been extended and because Larry DiNardo never objected to the Addendum. *See* 974 F.Supp. at 644.

Under Tennessee law, parties may accept terms of a contract and make the contract conditional upon some other event or occurrence. *See Disney v. Henry*, 656 S.W.2d 859, 861 (Tenn.Ct.App.1983). DiNardo argues that the Addendum is not enforceable because it was contingent on Larry DiNardo's approval.

Vanderbilt responds that the undisputed facts establish that there was no condition precedent to the Addendum's enforceability. Vanderbilt first points out that DiNardo did not make this argument until late in the litigation, and more importantly did not make this argument when Vanderbilt initially requested payment from Di-

3. Vanderbilt contends that DiNardo waived this defense because it was not suggested until DiNardo's deposition on October 28, 1996, and not brought before the court until DiNardo filed his amended answer in May, 1997. The district court considered DiNardo's theo- ry of defense, however, and we review the district court's grant of leave to amend under an abuse of discretion standard. *See United States v. Midwest Suspension and Brake*, 49 F.3d 1197, 1201 (6th Cir.1995).

Nardo in January 1995. Vanderbilt also contends that if Larry DiNardo found any of the language in the simple two-page Addendum objectionable, he should have objected immediately. Finally, Vanderbilt argues that if we decide that Larry Di-Nardo's approval was a condition precedent to enforceability, the condition was satisfied by Larry DiNardo's failure to object.

In *Disney*, the defendants sent a mailgram accepting a buyer's offer on their house "subject to review" of the actual sales contract. Although the court held that the contract could be conditioned on final approval of the sales contract, the court enforced the contract because the defendants' failure to object within a reasonable time validated the acceptance. *Id.* at 860.

Viewing the evidence in the light most favorable to DiNardo, as we must, we are convinced that there is a disputed question of material fact as to whether the Addendum is enforceable. There is a factual dispute as to whether Larry DiNardo's approval of the contract was a condition precedent to the Addendum's enforceability. Gerry DiNardo testified that he told Hoolahan that the contract extension was not "final" until Larry DiNardo looked at it.[4] Hoolahan's testimony on this point was consistent with DiNardo's: "He [Gerry DiNardo] said that he wanted to discuss the matter with you [Larry DiNardo], which I said certainly." Furthermore, although Callison's version of Larry DiNardo's role in the preparation of the contract extension differs from DiNardo's, it is undisputed that on August 25, nine days after Gerry DiNardo signed the Addendum, Callison sent Larry DiNardo an unsigned copy of the "draft Addendum." The cover sheet on a fax sent by Callison to DiNardo on September 27 closes with: "I would like your comments on the contract extension." From these facts, a jury

could conclude that Larry DiNardo's approval was required before the Addendum became a binding contract.

Of course, there is evidence that the Addendum was not contingent on Larry DiNardo's approval. Gerry DiNardo told others that he was happy with his contract extension, and Larry DiNardo never objected to the Addendum. This evidence, however, does not carry the day, because we view the evidence on summary judgment in the light most favorable to DiNardo and resolve all factual disputes in his favor. *See Birgel,* 125 F.3d at 950.

Likewise, Larry DiNardo's failure to object to the Addendum may have constituted acceptance of the Addendum's terms, *see, e.g., Disney,* 656 S.W.2d at 861, but on this record, we cannot resolve the issue on summary judgment. There is evidence from which a jury could find that Larry DiNardo's failure to object did not amount to acceptance of the Addendum. First, in contrast to *Disney,* 656 S.W.2d at 860–61, there is evidence explaining DiNardo's delay. The parties were primarily negotiating the radio and television contract during the fall of 1994. Callison testified that he could not recall whether he had any conversations with DiNardo in September about the contract extension. He explained: "The hot issue, if you will, was the radio and television contract. That was what was on my mind." It is not unreasonable to infer that the parties had not completely negotiated the details of the contract extension; the original contract did not expire for another year. On September 27, Callison asked Larry DiNardo for "his comments" on the contract extension. A jury could conclude from this solicitation that even Vanderbilt did not believe that the Addendum had been approved and was enforceable as of that time. We cannot say that Larry DiNardo's failure to object by December 12,

---

4. In general, parol evidence is admissible to show that a condition must be satisfied before a written contract will take effect. *See Ware*

*v. Allen,* 128 U.S. 590, 594, 9 S.Ct. 174, 32 L.Ed. 563 (1888) (written contract subject to approval by attorney).

1994, constitutes an acceptance of the Addendum as a matter of law.

Accordingly, we affirm the district court's judgment that the contract contained an enforceable liquidated damage provision, and we affirm the portion of the judgment reflecting damages calculated under the original five-year contract. We reverse the district court's judgment concluding that the Addendum was enforceable as a matter of law. We remand for a resolution of the factual issues as to whether Larry DiNardo's approval was a condition precedent to the enforceability of the Addendum and, if so, whether the condition was satisfied by Larry DiNardo's failure to object.

We affirm in part, reverse in part, and remand the case to the district court for further proceedings consistent with this opinion.

DAVID A. NELSON, Circuit Judge, concurring in part and dissenting in part.

If section eight of the contract was designed primarily to quantify, in an objectively reasonable way, damages that the university could be expected to suffer in the event of a breach, such damages being difficult to measure in the absence of an agreed formula, the provision is enforceable as a legitimate liquidated damages clause. If section eight was designed primarily to punish Coach DiNardo for taking a job elsewhere, however, the provision is a penalty unenforceable under Tennessee law. My colleagues on the panel and I are in agreement, I believe, on both of these propositions. We disagree, however, as to section eight's primary function.

It seems to me that the provision was designed to function as a penalty, not as a liquidation of the university's damages. Insofar as the court holds otherwise, I am constrained to dissent. In all other respects, I concur in Judge Gibson's opinion and in the judgment entered pursuant to it.

My principal reasons for viewing section eight as a penalty are these: (1) although the damages flowing from a premature resignation would normally be the same whether or not Coach DiNardo took a job elsewhere, section eight does not purport to impose liability for liquidated damages unless the coach accepts another job; (2) the section eight formula incorporates other variables that bear little or no relation to any reasonable approximation of anticipated damages; and (3) there is no evidence that the parties were attempting, in section eight, to come up with a reasonable estimate of the university's probable loss if the coach left. I shall offer a few words of explanation on each of these points.

Section eight does not make Coach DiNardo liable for any liquidated damages at all, interestingly enough, unless, during the unexpired term of his contract, he "is employed or performing services for a person or institution other than the University . . . ." But how the coach spends his post-resignation time could not reasonably be expected to affect the university's damages; should the coach choose to quit in order to lie on a beach somewhere, the university would presumably suffer the same damages that it would suffer if he quit to coach for another school. The logical inference, therefore, would seem to be that section eight was intended to penalize the coach for taking another job, and was not intended to make the university whole by liquidating any damages suffered as a result of being left in the lurch.

This inference is strengthened, as I see it, by a couple of other anomalies in the stipulated damages formula. First, I am aware of no reason to believe that damages arising from the need to replace a prematurely departing coach could reasonably be expected to vary in direct proportion to the number of years left on the coach's contract. Section eight, however, provides that for every additional year remaining on the contract, the stipulated damages will go up by the full amount of the annual take-home pay contemplated

under the contract. Like the "other employment" proviso, this makes the formula look more like a penalty than anything else.

Second, the use of a "take-home pay" measuring stick suggests that the function of the stick was to rap the coach's knuckles and not to measure the university's loss. Such factors as the number of tax exemptions claimed by the coach, or the percentage of his pay that he might elect to shelter in a 401(k) plan, would obviously bear no relation at all to the university's anticipated damages.

Finally, the record before us contains no evidence that the contracting parties gave any serious thought to attempting to measure the actual effect that a premature departure could be expected to have on the university's bottom line. On the contrary, the record affirmatively shows that the university did not attempt to determine whether the section eight formula would yield a result reasonably approximating anticipated damages. The record shows that the university could not explain how its anticipated damages might be affected by the coach's obtaining employment elsewhere, this being a subject that the draftsman of the contract testified he had never thought about. And the record shows that the question of why the number of years remaining on the contract would have any bearing on the amount of the university's damages was never analyzed either.

In truth and in fact, in my opinion, any correspondence between the result produced by the section eight formula and a reasonable approximation of anticipated damages would be purely coincidental. What section eight prescribes is a penalty, pure and simple, and a penalty may not be enforced under Tennessee law. On remand, therefore, in addition to instructing the district court to try the factual questions identified in Judge Gibson's opinion, I would instruct the court to determine the extent of any actual damages suffered by the university as a result of Coach DiNardo's breach of his contract. Whether more than the section eight figure or less, I believe, the university's actual damages should be the measure of its recovery.

CLAY, Circuit Judge, concurring in part and dissenting in part.

Because I would affirm the ruling below in all respects, I dissent from Part III.B of the court's opinion. Even if we conclude that the approval of the contract extension by Larry DiNardo, Gerry DiNardo's brother and attorney, was a condition precedent to the enforceability of the Addendum, a grant of summary judgment on behalf of Vanderbilt was appropriate because relevant circumstantial and direct evidence support the conclusion that the contract was agreed upon. This evidence, combined with Larry DiNardo's failure to object to the contract extension, causes me to conclude that summary judgment was properly granted.

The Court's opinion correctly notes that in *Disney v. Henry*, 656 S.W.2d 859 (Tenn. Ct.App.1983), the state court held that where enforcement of a sales contract was expressly conditioned on the sellers' final approval, the sellers' failure to object to the terms and conditions of the contract within a reasonable time validated the acceptance. *Disney*, 656 S.W.2d at 861. However, the Court's opinion fails to note that in determining that a reasonable time had lapsed, the state court relied exclusively on the fact that the sellers had allowed the buyers to take concrete steps in reliance on the contract. *Id.* at 860–61.

Particularly in this light, the facts on record establish that Larry DiNardo's failure to object validated his brother's acceptance of the contract. Following lopsided losses by Vanderbilt's football team to close out the 1993 season, there was rampant speculation that Gerry DiNardo would be fired. The magazine *Sports Illustrated* listed him as a coach on the "hot seat." By early 1994, Vanderbilt's athletic department became aware that the coach's status was becoming "more and more of an issue in recruiting." This evidence indicates that due to this concern about the coach's status, Vanderbilt initiated contract extension discussions specifically in order to

quiet speculation of instability in the football program.

As a result, Vanderbilt announced the signing of the Addendum almost immediately—presumably to quell the rumors of Gerry DiNardo's impending dismissal. Local sports columnists applauded the move precisely because it put to rest rumors of the coach's firing and the possibility of ensuing instability. Even more significantly, the coach himself confirmed that the deal was done. In remarks published on August 20, 1994, Gerry DiNardo expressed his happiness with the contract extension and his relief that this issue had been settled. Among other things, the coach said:

> [The extension] sends a message publicly that I've known right along, that [the athletic director] and the chancellor are very supportive of us. . . . I want less distraction, less public controversy, and the best way to do that is to keep myself out of the picture with the public as much as possible. I don't want people talking about me, about external parts of football. I want our players to be the focus.

\* \* \* \*

> I always felt they were committed, but actually having it makes me feel big time happy. I remember when we were at Colorado and they gave [the head coach an extension] after three years. It means a lot to our assistants. It's pretty important when someone does that for you. Then, it's easy to circle the wagons and identify the enemy. There is no second-guessing.

Vanderbilt and Gerry DiNardo thus both took steps immediately in reliance on the Addendum by moving forcefully to put to rest any uncertainty about the coach's job security and potential instability in the football program.

Indeed, Gerry DiNardo's pronouncement embracing the contract extension renders Larry DiNardo's failure to object to Vanderbilt's announcement of the extension particularly significant. Vanderbilt

asked Larry DiNardo in late August and again in late September of 1994 for any comments he might have on the Addendum. (This occurred after Gerry DiNardo had already signed the Addendum extending his contract on August 17, 1994, but had informed Vanderbilt that notwithstanding the fact that he had signed the extension, he still would like to have his brother review it.) Larry DiNardo said nothing—even though the coach had already publicly expressed his happiness that the extension was complete and Vanderbilt had announced the extension to the world.

Taking all of these facts into account, and viewing this evidence in the light most favorable to the defendant, I would hold that Larry DiNardo's failure to object to the Addendum validated the coach's acceptance, even assuming that Gerry DiNardo's acceptance was initially conditional in nature, and so put the Addendum into effect. Accordingly, I concur in the Court's opinion with the exception of Part III.B, from which I dissent for the reasons set forth above.