[Cite as *Kent State Univ. v. Ford*, 2015-Ohio-41.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# PORTAGE COUNTY, OHIO

| | | |
|---|---|---|
| KENT STATE UNIVERSITY, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2013-P-0091** |
| GENE A. FORD, et al., | : | |
| Defendant-Appellant. | : | |

Civil Appeal from the Portage County Court of Common Pleas, Case No. 2011 CV 00511.

Judgment: Affirmed.

*Lawrence R. Bach, William G. Chris,* and *Rodd A. Sanders,* Roderick Linton Belfance LLP, One Cascade Plaza, 15th Floor, Akron, OH 44308 (For Plaintiff-Appellee).

*Susan M. Audey* and *Benjamin C. Sasse,* Tucker, Ellis, L.L.P., 950 Main Avenue, Suite 1100, Cleveland, OH 44113, and *Frederick Byers,* 414 North Erie Street, 2nd Floor, Toledo, OH 43604 (For Defendant-Appellant).

DIANE V. GRENDELL, J.

{¶1} Defendant-appellant, Gene A. Ford, appeals from the judgments of the Portage County Court of Common Pleas, granting summary judgment in favor of plaintiff-appellee, Kent State University, on its claim for breach of contract, and awarding damages against Ford in the amount of $1.2 million. The issues to be determined in this case are whether a contract with a liquidated damages clause is unenforceable when it requires a breaching university coach to pay his salary for each

year remaining under the contract, when there is limited evidence of actual damages, and whether damages in such a case can include only the salary of a replacement coach. For the following reasons, we affirm the decision of the lower court.

{¶2} On April 26, 2011, Kent State filed a Complaint against Ford and Bradley University, asserting that Ford, the former head coach of the men's basketball team at Kent State, breached his contract by terminating his employment with Kent State four years before the contract's expiration and commencing employment with Bradley University. Count One raised a claim for Breach of Contract, based on Ford's unilateral termination of the agreement. Count Two claimed Breach of Fiduciary Duty, based on alleged duties owed by Ford to Kent State. Count Three raised a claim for Tortious Interference with a Contract against Bradley University, for inducing Ford to breach his employment contract.

{¶3} Ford filed his Answer on May 27, 2011. Bradley University filed its Answer on the same date.[1]

{¶4} The following facts giving rise to the filing of the Complaint were presented through deposition testimony and affidavits:

{¶5} In April of 2008, Ford and Kent State executed an Employment Contract, employing Ford as Kent State's head men's basketball coach for a period of four years, with an option for a fifth year. The Contract included his salary, supplemental salary, and various incentives based on performance. It also contained the following provision:

---

1. Subsequent to the filing of its Complaint, Kent State made multiple requests to amend it, adding another claim and party, Parker Executive Search. An Order and Journal Entry was later filed, based on the parties' agreement, dismissing the claims against Parker, the Civil Conspiracy claim against Bradley, and the First and Second Amended Complaints. The original Complaint and responses were deemed refiled.

GENE A. FORD recognizes that his promise to work for the UNIVERSITY for the entire term of this four (4) year Contract is of the essence of this Contract with the UNIVERSITY. GENE A. FORD also recognizes that the UNIVERSITY is making a highly valuable investment in his continued employment by entering into this Contract and its investment would be lost were he to resign or otherwise terminate his employment with the UNIVERSITY prior to the expiration of this Contract. Accordingly, he will pay to the UNIVERSITY as liquidated damages an amount equal to his base and supplemental salary, multiplied by the number of years (or portion(s) thereof) remaining on the Contract.

{¶6} Further, the contract provided that if Ford terminated his employment prior to the contract's expiration, "and is employed or performing services for a person or institution other than the UNIVERSITY," he "shall pay * * * an amount equal to the balance of the then-current total annual salary due for the remaining amount of the term of this Contract."

{¶7} In April 2010, Ford and Kent State renegotiated and executed a new Employment Contract, lasting for a term of five years, which increased his salary and supplemental salary by a total of $100,000, for a total salary of $300,000. This contract contained the same liquidated damages provision as above, changing only the number of years under the contract.

{¶8} Joel Nielsen, the Kent State athletic director, testified that in early 2011, he received a phone call from Ford's agent, requesting permission for Ford to speak to other schools regarding employment. Nielsen granted such permission following the

3

conclusion of the basketball season. On March 26, 2011, Ford made Nielsen aware of his conversations with Bradley University and expressed his possible interest in taking a coaching position there. At that time, Nielsen reminded Ford of the liquidated damages provision in the Contract. Soon thereafter, Ford accepted the position at Bradley University, at an annual salary of $700,000. Nielsen hired Coach Robert Senderoff in early April 2011 to replace Ford.

{¶9} Nielsen testified that the liquidated damages clause was included to protect the University by providing coaching continuity, which aids in recruiting players. Nielsen did not know of any players who left the program or of any specific recruits that may have decided not to attend Kent State because of Ford's departure, although he believed it would impact some potential future recruits. Nielsen explained the cost associated with conducting a coaching search to replace Ford, including time and travel for interviews. He outlined as potential damages the "loss of investment" in Ford, including "equity" built up with fans and donors. He conceded that, when coaches left in the past, the team continued to perform well.

{¶10} Thomas Kleinlein, Kent State's executive associate athletic director, testified that Ford had difficulty deciding whether to go to Bradley, and was concerned about having to pay the liquidated damages clause. Regarding potential damages resulting from Ford's departure, season ticket sales and advance ticket sales were "behind." Kleinlein also noted that there are often large "staff transitional costs" when a head coach leaves.

{¶11} Dr. Lester Lefton, president of Kent State University, testified that liquidated damages "make up some of the differences" from the loss in ticket sales, advertising, recruiting and "having to start all over again" when a coach leaves

4

prematurely. He believed that such damages "deter" individuals from leaving early. Dr. Lefton explained that when a coach leaves prior to the expiration of the contract, "the program suffers, recruiting suffers, ticket sales suffer, alumni and fan support suffers, [and] donations suffer." He testified that the liquidated damages clause contained in Ford's contract was similar to those currently used for head basketball and football coaches at Kent State and it was consistent with past policy.

{¶12} Dr. Lefton opined that, at the time the second contract was signed by Ford, he "fully understood what liquidated damages were because he was trying to have them removed." He believed, from conversations with presidents from other universities, that they included similar liquidated damages clauses in their contracts.

{¶13} Liang Kennedy, Kent State's athletic director until June of 2010, offered Ford his first head coaching contract at Kent State in April 2008. Kennedy asserted that the liquidated damages clause protects the coach and the institution's investment in the coach and the program. At the time the second contract was negotiated, Ford wanted the liquidated damages clause to be changed and asked for a "graduated reduction," i.e., the damages would decrease as the contract became closer to expiring. Ford eventually agreed to accept the liquidated damages clause as it had been previously and signed the new contract.

{¶14} Kennedy testified that the base salary was used as the foundation to determine the amount of liquidated damages. He noted that if Ford left, consequences to the program would include decreased revenue, fundraising, and community outreach, which they "established * * * would cost about a year's salary per year." He explained that Kent State did not do a "financial analysis" prior to establishing the liquidated damages clause in Ford's contract.

5

**{¶15}** Regarding damages that occurred after Ford's departure, Kennedy noted that he was disappointed with the results of a recent basketball outing. Kennedy explained that the goodwill of the program and the community outreach would suffer without Ford, since Ford was able to achieve high levels of attendance at community events. He also pointed to the loss of an effective director of basketball operations.

**{¶16}** Ford filed a Motion for Summary Judgment on January 17, 2012. He argued that Kent State suffered no damages as a result of his departure. He asserted that the liquidated damages clause was defective, since its objective was "punitive deterrence of breach," and the amount was disproportionate to any anticipated or actual damages. On the same date, Bradley University filed a Motion for Summary Judgment.

**{¶17}** Kent State filed its Motions for Partial Summary Judgment against Bradley University and Ford on the same date, arguing that the liquidated damages clause was valid and enforceable against Ford.

**{¶18}** On July 12, 2013, the court filed an Order and Journal Entry. The court concluded that Ford breached his employment contract and that the liquidated damages provision was enforceable. The court denied Ford's request for summary judgment for Breach of Contract but granted his request on the claim for Breach of Fiduciary Duty. In a separate Order and Journal Entry on the same date, the court granted Kent State's Partial Motion for Summary Judgment for Breach of Contract, finding that, pursuant to the valid liquidated damages clause, Kent State was entitled to the damages specified in the contract.

**{¶19}** On July 12 and 24, 2013, the court filed two additional Orders and Journal Entries, granting summary judgment in favor of Kent State and denying Bradley's Motion for Summary Judgment, on the claim for Tortious Interference, but required that

6

damages be proven at trial.  On September 25, 2013, Kent State filed a Notice of Dismissal against Bradley University.

{¶20} On October 11, 2013, the trial court filed a Final Judgment Entry, finding that, pursuant to the stipulation of the parties, $1.2 million was due to Kent State under the liquidated damages clause of the contract and awarded damages in that amount.

{¶21} Ford timely appeals and raises the following assignment of error:

{¶22} "The trial court erred when it entered final judgment in favor of Plaintiff-Appellee Kent State University and awarded Kent State $1.2 million in liquidated damages after granting Kent State's cross-motion for summary judgment on its claim for breach of contract and denying Defendant-Appellant Gene A. Ford's motion for summary judgment on the same claim."

{¶23} Pursuant to Civil Rule 56(C), summary judgment is proper when (1) the evidence shows "that there is no genuine issue as to any material fact" to be litigated, (2) "the moving party is entitled to judgment as a matter of law," and (3) "it appears from the evidence * * * that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence * * * construed most strongly in the party's favor."  A trial court's decision to grant summary judgment is reviewed by an appellate court under a de novo standard of review.  *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996).  "A de novo review requires the appellate court to conduct an independent review of the evidence before the trial court without deference to the trial court's decision."  (Citation omitted.)  *Peer v. Sayers*, 11th Dist. Trumbull No. 2011-T-0014, 2011-Ohio-5439, ¶ 27.

**{¶24}** Ford argues that the liquidated damages clause in his employment contract was an unenforceable penalty and does not comply with the factors contained in *Samson Sales, Inc. v. Honeywell, Inc.*, 12 Ohio St.3d 27, 465 N.E.2d 392 (1984).

**{¶25}** Liquidated damages are "an agreed upon amount of money to be paid in lieu of actual damages in the event of a breach of contract." (Citation omitted.) *Windsor v. Riback*, 11th Dist. Geauga Nos. 2007-G-2775 and 2007-G-2781, 2008-Ohio-2005, ¶ 53. "Liquidated damages * * * which are consistent with the principle of compensation * * * are permitted." *Cleveland Constr., Inc. v. Gatlin Plumbing & Heating, Inc.*, 11th Dist. Lake No. 99-L-050, 2000 Ohio App. LEXIS 3215, 5 (July 14, 2000).

**{¶26}** When a party challenges a liquidated damages provision, the court must "step back and examine it in light of what the parties knew at the time the contract was formed and in light of an estimate of the actual damages caused by the breach." *Lake Ridge Academy v. Carney*, 66 Ohio St.3d 376, 382, 613 N.E.2d 183 (1993); *Village Station Assocs. v. Geauga Co.*, 84 Ohio App.3d 448, 451, 616 N.E.2d 1201 (11th Dist.1992) ("liquidated damages must have some relation to actual damages").

**{¶27}** In *Samson*, the Supreme Court of Ohio set forth the test for determining whether a liquidated damages provision should be upheld:

> Where the parties have agreed on the amount of damages, ascertained by estimation and adjustment, and have expressed this agreement in clear and unambiguous terms, the amount so fixed should be treated as liquidated damages and not as a penalty, if the damages would be (1) uncertain as to amount and difficult of proof, and if (2) the contract as a whole is not so manifestly unconscionable, unreasonable, and disproportionate in amount as to justify the

8

conclusion that it does not express the true intention of the parties, and if (3) the contract is consistent with the conclusion that it was the intention of the parties that damages in the amount stated should follow the breach thereof.

12 Ohio St.3d 27, 465 N.E.2d 392, at the syllabus.

{¶28} The application of *Samson* to the facts of this case supports a conclusion that the liquidated damages provision was properly enforced by the lower court. The parties agreed on an amount of damages, stated in clear terms in Ford's second employment contract. Regarding the first factor, the difficulty of ascertaining the damages resulting from Ford's breach, it is apparent that such damages were difficult, if not impossible, to determine. Based on the testimony presented, the departure of a university's head basketball coach may result in a decrease in ticket sales, impact the ability to successfully recruit players and community support for the team, and require a search for both a new coach and additional coaching staff. Many of these damages cannot be easily measured or proven. This is especially true given the nature of how such factors may change over the course of different coaches' tenures with a sports program or team.

{¶29} A similar conclusion regarding the difficulty of ascertaining damages from a university coach's breach was reached in *Vanderbilt Univ. v. DiNardo*, 174 F.3d 751 (6th Cir.1999), one of the few cases related to liquidated damages in a university coaching scenario. The *DiNardo* Court cited the district court's opinion, which found that damages from losing a head football coach are uncertain and "[i]t is impossible to estimate how the loss of a head football coach will affect alumni relations, public support, football ticket sales, contributions, etc. * * * [T]o require a precise formula for

9

calculating damages resulting from the breach of contract by a college head football coach would be tantamount to barring the parties from stipulating to liquidated damages evidence in advance." *Id.* at 756. The Court held that the university's head football coach was hired "for a unique and specialized position," with the parties understanding that damages could not be easily ascertained if a breach occurred, especially given that the provision was reciprocal and was the result of negotiations by both parties, which is the case in the present matter as well. *Id.* at 757.

{¶30} Ford argues that his duty was to coach the team and the only damages that would result from his breach were from hiring a replacement coach, damages which are easily measurable. The court in *DiNardo* rejected this exact argument, holding that "[t]he potential damage to [Vanderbilt] extends far beyond the cost of merely hiring a new head football coach." *Id.* at 756. As he notes in his brief, Ford also had supplemental duties, such as fundraising and marketing. The contractual requirement that he perform these duties when requested represents the inherent importance and value in a basketball coach participating in activities benefitting the basketball program. Factors such as the potential loss of recruits and revenue that could result if a coach's early departure impacted the team's results are directly tied to his duties as a coach.

{¶31} In this case, the contract stated that the liquidated damages clause was based on Kent State's "investment in [Ford's] continued employment." This is similar to *DiNardo*, where language was included regarding the importance of the "long-term commitment" and stability of the program. *Id.* at 756. The desire for Ford's continued employment, the renegotiation of his contract prior to its expiration, and Kennedy's statements to Ford that the contract would be renegotiated within a few years, made it clear that Kent State desired Ford to have long-term employment, which was necessary

10

to establish the stability in the program that would benefit recruitment, retention of assistant coaching staff, and community participation and involvement. The breach of the contract impacted all of these areas.

{¶32} Ford cites *Fleming v. Kent State Univ.*, Ct. of Cl. No. 2011-09365 (Oct. 4, 2013), noting that Kent State advanced, and prevailed on, the opposite position in that case, i.e., that a liquidated damages clause was unenforceable because damages were not uncertain. *Fleming*, however, has recently been reversed by the Tenth District in *Fleming v. Kent State Univ.*, 10th Dist. Franklin No. 13AP-942, 2014-Ohio-3471. Although *Fleming* involved the opposite scenario, i.e., where the coach's employment was terminated by the university, similar to the present case, the court held that damages were uncertain, due to the nature of the coach's employment and the difficulty in estimating potential lost business opportunities. *Id.* at ¶ 30-31.

{¶33} Ford argues that the lack of certainty prong also does not apply because there were no historic adverse effects on ticket sales, recruiting, or donor contributions when past coaches left Kent State. Even if this was the case, it has little bearing on the fact that damages to Kent State were uncertain at the time the contract was executed. Furthermore, Ford's unique abilities, such as his skill in connecting with the community and success in obtaining donations, were noted in the testimony.

{¶34} In the second factor, we must evaluate whether the contract was unconscionable and disproportionate in amount, such that it does not express the parties' intent.

{¶35} Ford argues that the liquidated damages provision is unenforceable because it is disproportionate to the foreseeable possible damage. He asserts that

11

Kent State failed to estimate its damages prior to including the liquidated damages clause and instead chose an arbitrary amount.

**{¶36}** As an initial matter, we note that there appears to be nothing unconscionable about the liquidated damages clause. "A contract is unconscionable if it did not result 'from real bargaining between parties who had freedom of choice and understanding and ability to negotiate in a meaningful fashion.'" (Citations omitted.) *Lake Ridge*, 66 Ohio St.3d at 383, 613 N.E.2d 183. Ford was not an unsophisticated party and testimony indicated that he had consulted with an attorney and/or agent prior to signing the second employment contract. There is no evidence to show that he did not make an informed choice, especially given that he clearly negotiated in an attempt to remove the liquidated damages clause.

**{¶37}** Regarding the alleged unreasonableness of the damages, Ford takes issue with the fact that actual damages were not proven by Kent State. In cases involving a valid liquidated damages clause, however, "the party seeking such damages need not prove that actual damages resulted from a breach." (Citation omitted.) *Physicians Anesthesia Serv., Inc. v. Burt*, 1st Dist. Hamilton No. C-060761, 2007-Ohio-6871, ¶ 20; *USS Great Lakes Fleet, Inc. v. Spitzer Great Lakes, Ltd.*, 85 Ohio App.3d 737, 741, 621 N.E.2d 461 (9th Dist.1993) (the court agreed with the "majority view" that proof of actual damages is not required to prevail on a liquidated damages claim); *Kurtz v. Western Prop., L.L.C.*, 10th Dist. Franklin No. 10AP-1099, 2011-Ohio-6726, ¶ 41.

**{¶38}** While some evidence of the value of the actual damages helps to determine the reasonableness of the liquidated damages, based on the record, we find that the damages were reasonable. Even if the damages to Kent State were based solely on hiring a replacement coach, finding a coach of a similar skill and experience

12

level as Ford, which was gained based partially on the investment of Kent State in his development, would have an increased cost. This is evident from the fact that Ford was able to more than double his yearly salary when hired by Bradley University. *See Burt* at ¶ 20 (upholding a liquidated damages clause based on the high market cost of obtaining a replacement employee). The salary Ford earned at Bradley shows the loss of market value in coaching experienced by Kent State, $400,000 per year, for four years. Although this may not have been known at the time the contract was executed, it could have been anticipated, and was presumably why Kent State wanted to renegotiate the contract and establish a new five-year coaching term. As noted above, there was also an asserted decrease in ticket sales, costs associated with the trip for the coaching search, and additional potential sums that may be expended.

{¶39} Regarding Ford's contention that the liquidated damages contained in his employment contract were not properly estimated beforehand, as required under the *Samson* test, but were merely an arbitrary number, it has been noted by several courts that estimation by exacting standards cannot be achieved in every scenario. *See DiNardo,* 174 F.3d at 755-757 (allowing salary to be used for liquidated damages since future damages were unquantifiable); *Burt* at ¶ 20 (given the unpredictable market rate at the time of the breach, liquidated damages tied to an employee's salary were a reasonable prediction). Kennedy also testified that the base salary was used for the liquidated damages, based on considerations such as potential fundraising and revenue losses, and a review of the industry standard, resulting in the conclusion that it would cost about a year's salary to cover damages.

{¶40} In the third factor, the court is to consider whether the contract is consistent with the fact that the parties intended that the damages follow the breach.

13

The provision itself in this case is not ambiguous and it is clear that it would apply if the contract was breached by either party. Testimony was presented that such clauses, although they differ from contract to contract, are common for university coaches. Nothing indicated that the clause did not represent the parties' intent, especially given that testimony demonstrated Ford was aware of the provision and even attempted to change it during negotiations prior to signing the second contract.

{¶41} Finally, Ford argues that the liquidated damages clause is unenforceable because it acted as a penalty to punish him for breaking his promise.

{¶42} "Whether the subject provision constitutes an illegal penalty provision or a liquidated damages provision depends on the facts and circumstances of each case." *Brunswick Ltd. Partnership v. Feudo*, 171 Ohio App.3d 369, 2007-Ohio-2163, 870 N.E.2d 804, ¶ 11 (11th Dist.).

{¶43} As discussed extensively above, there was justification for seeking liquidated damages to compensate for Kent State's losses, and, thus, there was a valid compensatory purpose for including the clause. While there was some testimony the clause would deter Ford from leaving, this would be true of liquidated damages clauses in almost every contract, since an award of damages deters a breach. It appears that at least some losses were contemplated prior to the inclusion of this provision in the contract. Given all of the circumstances and facts in this case, and the consideration of the factors above, we cannot find that the liquidated damages clause was a penalty.

{¶44} In his second issue, Ford argues that the liquidated damages clause is unenforceable since a party cannot recover for a breach of contract when there is no proof of damages.

14

{¶45} As discussed above, when a liquidated damages clause is included, it is not required that actual damages be proven. The cases cited by Ford within this argument do not include a liquidated damages clause. To the extent that they address the issue of whether an employee's breach of an employment contract is compensable only by damages for his replacement, this has been thoroughly addressed above and fails to take into consideration the value of the unique services provided by a university athletic coach.

{¶46} The sole assignment of error is without merit.

{¶47} For the foregoing reasons, the judgments of the Portage County Court of Common Pleas are affirmed. Costs to be taxed against the appellant.


CYNTHIA WESTCOTT RICE, J., concurs,

TIMOTHY P. CANNON, P.J., dissents with a Dissenting Opinion.


_____


TIMOTHY P. CANNON, P.J., dissenting.

{¶48} This case was resolved on the parties' cross-motions for summary judgment. On appeal, Ford's sole assignment of error asserts the trial court erred by granting Kent State's motion for summary judgment on its claim for breach of contract and denying Ford's motion for summary judgment on the same claim. This case was not submitted to the trial court on stipulations or otherwise tried in any way on the merits. As a result, the case must be analyzed based on the standard set forth in Civ.R. 56. In a summary judgment exercise, the moving party must submit sufficient

evidentiary material to establish that it is entitled to judgment, i.e., that there are no genuine issues of material fact to be resolved in the case. *Fed. Home Loan Mtge. Corp. v. Zuga*, 11th Dist. Trumbull No. 2012-T-0038, 2013-Ohio-2838, ¶12. If the moving party meets this burden, the burden shifts to the non-moving party to produce sufficient evidentiary material that establishes there are genuine issues to be litigated, pursuant to Civ.R. 56(E). *Id.* The evidence submitted must be construed *in a light most favorable to the non-moving party*. *Id*. at ¶13.

{¶49} The test developed in Ohio to judge a stipulated damages provision was set forth by the Ohio Supreme Court in *Samson Sales, Inc. v. Honeywell, Inc.*:

> Where the parties have agreed on the amount of damages, ascertained by estimation and adjustment, and have expressed this agreement in clear and unambiguous terms, the amount so fixed should be treated as liquidated damages and not as a penalty, if the damages would be (1) uncertain as to amount and difficult of proof, and if (2) the contract as a whole is not so manifestly unconscionable, unreasonable, and disproportionate in amount as to justify the conclusion that it does not express the true intention of the parties, and if (3) the contract is consistent with the conclusion that it was the intention of the parties that damages in the amount stated should follow the breach thereof.

12 Ohio St.3d 27 (1984), syllabus, citing *Jones v. Stevens,* 112 Ohio St. 43 (1925), paragraph two of the syllabus.

{¶50} A challenge to a stipulated damages provision requires the court to "step back and examine it in light of what the parties knew at the time the contract was formed *and* in light of an estimate of the actual damages caused by the breach. If the provision was reasonable at the time of formation *and* it bears a reasonable (not necessarily exact) relation to actual damages, the provision will be enforced." *Lake Ridge Academy v. Carney*, 66 Ohio St.3d 376, 382 (1993), citing 3 Restatement of the Law 2d, Contracts, Section 356(1), at 157 (1981) (emphasis added).

{¶51} Here, the formula utilized in the Contract does not, with any reasonable clarity, demonstrate an approximation of anticipated, actualized damages; rather, it rotely requires the breaching party to pay the sum of the salary remaining to be paid on the Contract, irrespective of any other variables germane to a damages calculation. This formula neither suggests any reasonable estimate of Kent State's probable losses nor describes in any way the specific areas of damage to be included in the estimate.

{¶52} The formula utilized in the Contract, i.e., the number of years left on the Contract multiplied by Ford's yearly salary, produces a higher valuation of damages if the Contract is breached in the early years of the Contract rather than the last. Yet, such a disparity in valuation bears no reasonable relationship to the actual damages sustained. It is apparent the damages incurred by Kent State are essentially the same if the Contract is breached at any point during the Contract term. This formula may be the appropriate measure of damages if Kent State breached the Contract, as Ford's salary and the duration of the Contract is fixed. But to suggest the same measure of damages is appropriate in the event of a breach by Ford is absurd; there is no way the potential measure of damage to both parties would be remotely the same. When viewing the evidence submitted in a light most favorable to Ford, this lends itself to the suggestion that it was meant to penalize Ford, not compensate Kent State.

{¶53} Further, it is difficult to assess the actual damages that might be sustained by Kent State in the event of a breach by Ford. In construing the evidence in a light most favorable to Ford, a question of fact remains as to whether the parties intended Section 7 of the Contract to be a "reasonable estimate" of damages. Unlike *Vanderbilt Univ. v. DiNardo*, 174 F.3d 751, 757 (6th Cir.1999), where the liquidated damages were "in line with Vanderbilt's estimate of its actual damages," Kent State provided evidence

17

of only minimal damages (less than $2,000) that were actually incurred as a result of Ford breaching the Contract and accepting the coaching position at Bradley University. Additionally, although Kent State asserted the possibility of various consequential losses, inter alia, adverse effects on alumni relations, decreased ticket sales, and loss of public support, Kent State failed to support this contention with any evidentiary material that such losses transpired, or how the potential losses in these areas could have approached the significant stipulated damages figure. More significantly, it appears that all parties are in agreement that *no attempt was ever made* by Kent State to conduct an assessment of what the losses might be, or what items of damages should be included in the assessment, *prior to inclusion* of the clause in the Contract.

**{¶54}** The trial court and the majority herein cite to Kent State's contention that it lost a coach whose value increased by $400,000 since the signing of the Contract. However, assessment of damages in a liquidated damages case must be based on *recoverable* damages for breach. *See Lake Ridge*, *supra*, at 383. It is hard to imagine a circumstance under which the increase in the value of the coach would be a measure of damages in a breach of contract case, and it should not be considered a factor in assessing whether the stipulated liquidated damages clause is reasonable.

**{¶55}** In his brief, Ford cites to *Lake Ridge* for the proposition that whether a stipulation is for liquidated damages or a penalty is a question of law for the court. *See Lake Ridge*, *supra*, at 380. To support this statement of law, the Supreme Court of Ohio cited to a case from the U.S. Court of Appeals for the Fifth Circuit, applying Florida state law. *Id.*, quoting *Ruckelshaus v. Broward Cty. School Bd.*, 494 F.2d 1164, 1165 (5th Cir.1974). As recognized by the majority, however, the Supreme Court stated in *Samson Sales*: "Whether a particular sum specified in a contract is intended as a

18

penalty or as liquidated damages depends upon the operative facts and circumstances surrounding each particular case * * *." *Samson Sales, supra*, at 28-29. Often, the determination of whether it is a penalty or liquidated damages clause involves factual questions that cannot be resolved as a matter of law. *See Developers Diversified, Ltd. v. Graves,* 4th Dist. Ross No. 1131, 1985 Ohio App. LEXIS 8079, *4 (June 18, 1985) ("establishing whether liquidated damages are reasonable or a penalty is often a question of fact") and *Brunswick Ltd. Partnership v. Feudo*, 171 Ohio App.3d 369, 2007-Ohio-2163, ¶11 (11th Dist.).

{¶56} In this case, without stipulations, submission of evidence to a fact finder, and an assessment of the credibility of the relevant evidence, I believe it is impossible to determine whether the stipulated damages clause is reasonable and proportionate. Thus, it is inappropriate to conclude, as a matter of law, that there are no genuine issues of fact to be resolved, and the stipulated damages provision in the Contract is to be construed as liquated damages and not a penalty clause. There is significant evidence that Kent State did not make an effort, prior to or at the time of contracting, to identify either the types of damages or the amount of damages it would incur following a breach. There is evidence, however, that the damages sustained by Kent State as a result of a breach would be the same if a breach occurred in the last year of the Contract or in the second year of the Contract. As the evidence must be construed in a light most favorable to the non-moving party, the escalation clause contained in the Contract could be considered a penalty. As a result, there remain genuine issues of material fact to be litigated on this dispositive issue.

{¶57} For the foregoing reasons, I respectfully dissent from the opinion of the majority.

19