[Cite as *Kent State Univ. v. Bradley Univ.*, 2019-Ohio-2088.]

# IN THE COURT OF APPEALS

## ELEVENTH APPELLATE DISTRICT

## PORTAGE COUNTY, OHIO

| | | |
|---|---|---|
| KENT STATE UNIVERSITY, | : | **O P I N I O N** |
| Plaintiff-Appellant, | : | |
| - vs - | : | **CASE NO. 2017-P-0056** |
| BRADLEY UNIVERSITY, et al., | : | |
| Defendants-Appellees. | : | |

Civil Appeal from the Portage County Court of Common Pleas, Case No. 2015 CV 00216.

Judgment:  Affirmed in part, reversed in part, and remanded.

*William G. Chris*, *Lawrence R. Bach*, and *Todd A. Mazzola*, Roderick Linton Belfance LLP, 50 South Main Street, 10th Floor, Akron, OH  44308 (For Plaintiff-Appellant).

*William R. Kohlhase*, 416 Main Street, Suite 1125, Peoria, IL  61602; *Kevin M. Young* and *Chelsea R. Mikula* Tucker Ellis LLP, 950 Main Avenue, Suite 1100, Cleveland, OH 44113 (For Defendant-Appellee, Bradley University).

*Chad E. Murdock*, 228 West Main Street, P.O. Box 248, Ravenna, OH  44266 (For Defendant-Appellee, Gene Ford).

THOMAS R. WRIGHT, P.J.

{¶1}  Kent State University (KSU) appeals the trial court's decisions granting Bradley University and Gene Ford summary judgment and denying its motion to amend its complaint to conform to the evidence.  We affirm in part, reverse in part, and remand.

**{¶2}** KSU initially employed Ford as its head men's basketball coach for four years, beginning in April of 2008. Before expiration of the first contract, KSU and Ford agreed to an extended employment contract for a period of five years in April of 2010, which included a liquidated damages clause upon breach by either party.

**{¶3}** In a prior appeal between KSU and Ford only, we affirmed the trial court's decision granting KSU summary judgment and awarding it $1.2 million in liquidated damages against Ford for breach of his employment agreement. *Kent State Univ. v. Ford,* 11th Dist. Portage No. 2013-P-0091, 2015-Ohio-41, 26 N.E.3d 868. Although Bradley was a party to the prior trial court case, KSU voluntarily dismissed its claims against Bradley. *Id.* at ¶19.

**{¶4}** The case before us arises from KSU's refiled claims. KSU refiled suit against Bradley in March of 2015 and asserted three causes of action. It alleges that Bradley tortiously interfered with KSU's contract with Ford; that KSU is entitled to indemnity for its costs and fees in defending Ford's prior appeals; and that KSU is a third-party beneficiary entitled to $400,000 pursuant to Bradley's agreement with Ford.

**{¶5}** The trial court stayed the refiled proceedings pending resolution of Ford's appeal from the prior decision to the Ohio Supreme Court, and it lifted the stay when the Supreme Court declined jurisdiction and overruled Ford's motion for reconsideration. *Kent State Univ. v. Ford,* 143 Ohio St.3d 1441, 2015-Ohio-3427, 36 N.E.3d 189.

**{¶6}** Bradley filed its answer in July of 2016, following the trial court's denial of its motion to dismiss KSU's complaint. On September 2, 2016, KSU filed its first amended complaint adding Gene Ford as a defendant and adding two additional claims for relief against Ford and Bradley, including a claim for punitive damages. KSU alleged that

2

Bradley made fraudulent transfers to Ford to defraud KSU, as Ford's creditor, and that Bradley and Ford conspired to defraud KSU based on its staggered payments to Ford.

{¶7} In April of 2017, KSU and Bradley filed competing motions for summary judgment, and Ford's motion to dismiss was converted to a motion for summary judgment.

{¶8} On April 27, 2017, KSU moved the court to permit it to modify its complaint to conform to the evidence, pointing to Bradley's delayed responses to discovery as the cause, which were not produced until after a motion to compel was filed. KSU alleged that it had just recently discovered that Bradley paid Ford's attorney fees in excess of $100,000 pursuing his prior appeals to the court of appeals and the Ohio Supreme Court. KSU claims Bradley and Ford civilly conspired to divert funds owed to KSU, as the third-party beneficiary to Ford's agreement with Bradley. KSU's motion to amend its complaint to conform to the evidence was overruled without analysis on July 21, 2017.

{¶9} On July 27, 2017, the trial court overruled KSU's motion for summary judgment, granted Bradley's and Ford's motions for summary judgment on all of KSU's claims, and dismissed the case with prejudice.

{¶10} KSU's first of five assigned errors argues:

{¶11} "The trial court erred when it granted summary judgment against KSU on its tortious interference with contract claim. Summary judgment instead should have been granted in KSU's favor."

{¶12} We review summary judgment decisions de novo without deference to the trial court's decision, *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996), and pursuant to Civ.R. 56(C), which provides:

3

{¶13} "Summary judgment shall be rendered * * * [if the evidence shows] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. * * * A summary judgment shall not be rendered unless it appears from the evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor."

{¶14} "[I]f the moving party has satisfied its initial burden, the nonmoving party then has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing that there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party." *Dresher v. Burt,* 75 Ohio St.3d 280, 293, 662 N.E.2d 264 (1996).

{¶15} To establish a claim of tortious interference with contract, a plaintiff must show: "(1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of [proper] justification, and (5) resulting damages." (Citations omitted.) *PNH, Inc. v. Alfa Laval Flow, Inc.,* 130 Ohio St.3d 278, 2011-Ohio-4398, 958 N.E.2d 120, ¶39-40 (Lanzinger, J. dissenting); accord *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 85 Ohio St.3d 171, 176 1999-Ohio-260, 707 N.E.2d 853 (1999).

{¶16} KSU's complaint and motion for summary judgment allege that Bradley intentionally and improperly procured Ford's breach of his employment contract with KSU. The existence of Ford's contract and breach have been established as a matter of law. *Kent State Univ. v. Ford, supra.*

4

**{¶17}** Further, Bradley's knowledge that Ford was under contract with KSU at the time it contacted him to interview for their head coaching position is also undisputed.

**{¶18}** "To establish the intent element of a tortious interference with contract claim, a plaintiff must either (1) prove that the defendant acted with the purpose or desire to interfere with the performance of the contract or (2) prove that the defendant knew that interference was certain or substantially certain to occur as a result of its actions. *RFC Capital Corp. v. EarthLink, Inc.,* 10th Dist. Franklin No. 03AP–735, 2004-Ohio-7046, 2004 WL 2980402, ¶ 68." *Ginn v. Stonecreek Dental Care,* 12th Dist. Fayette No. CA2014-06-015, 2015-Ohio-1600, 30 N.E.3d 1034, ¶17.

**{¶19}** Here, Bradley knew that Ford was contractually obligated as KSU's head coach for an additional four years. This knowledge is sufficient to show an intentional interference; the interferer need not know the actual content of the existing agreement or its legal significance. *Ginn citing* Restatement (Second) of Torts §766 (1979), *Comment i. Comment i* states:

**{¶20}** *"i. Actor's knowledge of other's contract.* To be subject to liability under the rule stated in this Section, the actor must have knowledge of the contract with which he is interfering and of the fact that he is interfering with the performance of the contract. Although the actor's conduct is in fact the cause of another's failure to perform a contract, the actor does not induce or otherwise intentionally cause that failure if he has no knowledge of the contract. But it is not necessary that the actor appreciate the legal significance of the facts giving rise to the contractual duty, at least in the case of an express contract. *If he knows those facts, he is subject to liability even though he is mistaken as to their legal significance and believes that the agreement is not legally*

5

*binding or has a different legal effect from what it is judicially held to have.*" (Emphasis added.)

{¶21} The fourth element, whether Bradley lacked a "proper" justification upon hiring Ford while he was under contract with KSU, is contested.

{¶22} In *Fred Siegel Co., L.P.A. v. Arter & Hadden,* 85 Ohio St.3d 171, 176, 707 N.E.2d 853 (1999), the Ohio Supreme Court stated, "[w]e * * * reaffirm *Kenty* and hold that establishment of the fourth element of the tort of tortious interference with contract, lack of justification, requires proof that the defendant's interference with another's contract was improper." Upon restating that the elements had been established sufficient to overcome a motion to dismiss in *Kenty,* the Supreme Court concludes in part that "Kenty [sufficiently pleads] that appellees *maliciously* interfered with the contract * * *." (Emphasis added.) *Kenty v. Transamerica Premium Ins. Co.,* 72 Ohio St.3d 415, 419, 1995-Ohio-61, 650 N.E.2d 863 (1995).

{¶23} Malice means: "1. The intent, without justification or excuse, to commit a wrongful act. 2. Reckless disregard of the law or of a person's legal rights." Black's Law Dictionary (10th ed. 2014). "[A]ctual malice such as personal ill will, spite or hatred is not an essential element of the claim. *Elwert v. Pilot Life Ins. Co.* (1991), 77 Ohio App.3d 529, 602 N.E.2d 1219; *Reichman v. Drake* (1951), 89 Ohio App. 222, 45 O.O. 444, 100 N.E.2d 533; *MPS Trimco, Inc. v. Lewis* (Feb. 18, 1993), Cuyahoga App. No. 61829, unreported, at 7, 1993 WL 39921." *Hoyt, Inc. v. Gordon & Assoc., Inc.,* 104 Ohio App.3d 598, 604, 662 N.E.2d 1088 (8th Dist.1995).

{¶24} The Supreme Court likewise adopted Sections 767 and 768 of the Restatement of the Law 2d, Torts. Section 767 sets forth general factors to use to

6

determine whether conduct is "improper" for a tortious interference with contract claim. This section sets forth a nonexhaustive list of important factors to weigh. *Kand Medical, Inc. v. Freund Medical Products, Inc.,* 963 F.2d 125, 128 (6th Cir.1992). It provides:

**{¶25}** "[I]n determining whether an actor has acted improperly in intentionally interfering with a contract or prospective contract of another, consideration should be given to the following factors: (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties." (Citation omitted.) *Fred Siegal Co., L.P.A., supra,* at 178-179*.*

**{¶26}** Section 768(1) sets forth a defense for fair competition when a contract is terminable at will. At-will employment is "[e]mployment that is usu[ally] undertaken without a contract and that may be terminated at any time, by either the employer or the employee, without cause." Black's Law Dictionary (10th ed. 2014). The KSU-Ford employment agreement was for a five-year period and not an at-will employment agreement, and as such, Section 768(1) and the defense of fair competition is inapplicable.

**{¶27}** However, Section 768(2) states: "The fact that one is a competitor of another for the business of a third person does not prevent his causing a breach of an existing contract with the other from being an improper interference if the contract is not terminable at will." And the comment on subsection two explains:

7

**{¶28}** "When B is legally free to deal either with C or with A, freedom to engage in competition implies a privilege on the part of A to induce B to deal with him rather than with C. But when B is legally obligated to deal with C, A is not justified by the mere fact of competition in inducing B to commit a breach of his legal duty. Under the general rule stated in §767, the social interest in the security of transactions and the greater definiteness of C's expectancy outweigh the interests in A's freedom of action in this situation. But the rule stated in Subsection (2) is limited to the case in which A's claim that his interference is not improper rests solely on the fact of competition and his purpose to advance his interest in that competition, as stated in Subsection (1). His interference may be proper because of other circumstances including the fact of competition. (See § 769). That fact does not negative the existence of a justification appropriate on other grounds."

**{¶29}** Thus, we employ the factors in Section 767 to determine if Bradley's interference here was "improper." *Fred Siegel*, supra. The plaintiff has the burden to prove that the defendant lacked a proper justification in securing the breach of the agreement. *Long v. Mt. Carmel Health Sys.,* 10th Dist. Franklin No. 16AP-511, 2017-Ohio-5522, 93 N.E.3d 436, ¶27.

**{¶30}** The Ford-KSU employment agreement states in pertinent part:

**{¶31}** "2. a. The term of this contract * * * shall be for a period of five (5) years and shall expire on March 31, 2015.

**{¶32}** "* * *

**{¶33}** "7. GENE A. FORD recognizes that his promise to work for the UNIVERSITY for the entire term of his five (5) year Contract is of the essence of this

8

Contract with the UNIVERSITY. GENE A. FORD also recognizes that the UNIVERSITY is making a highly valuable investment in his continued employment by entering into this Contract and its investment would be lost were he to resign or otherwise terminated his employment with the UNIVERSITY prior to the expiration of the Contract. * * *

**{¶34}** "a. * * * GENE A. FORD agrees that in the event he resigns or otherwise terminates his employment prior to March 31, 2015, and is employed or performing services for a person or institution other than the UNIVERSITY or the UNIVERSITY terminates GENE A. FORD prior to that date then the initiating party shall pay to the other an amount equal to the balance of the then-current total annual salary due for the remaining amount of the term of the Contract * * *.

**{¶35}** "b. In addition, GENE A. FORD agrees that he will neither seek potential job prospects nor accept a position within the MAC nor will he seek job prospects with any other program during this agreement.

**{¶36}** "c. If, however, he is sought for a job prospect outside of the MAC, GENE A. FORD will not respond to such inquiries without the permission of the Director, with such permission not be unreasonably withheld. * * *

**{¶37}** "d. Permission pursuant to paragraph 7c above shall be conditioned upon the requestor agreeing, prior to the granting of such permission, to pay such termination costs described in 7a above to the UNIVERSITY should GENE A. FORD accept a position with the requestor and GENE A. FORD agrees that if he accepts such a position, he shall forfeit any bonuses earned during that termination year."

**{¶38}** "In construing the terms of a written contract, the primary objective is to give effect to the intent of the parties, which we presume rests in the language that they have

9

chosen to employ. *Saunders v. Mortensen,* 101 Ohio St.3d 86, 2004-Ohio-24, 801 N.E.2d 452, at ¶9, citing *Kelly v. Med. Life Ins. Co.* (1987), 31 Ohio St.3d 130, 31 OBR 289, 509 N.E.2d 411, paragraph one of the syllabus. 'Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument.' * * * Where the terms are clear and unambiguous, a court need not go beyond the plain language of the agreement to determine the rights and obligations of the parties. * * *" *In re All Kelley & Ferraro Asbestos Cases,* 104 Ohio St.3d 605, 2004-Ohio-7104, 821 N.E.2d 159, ¶29.

**{¶39}** "[A] writing * * * will be read as a whole, and the intent of each part will be gathered from a consideration of the whole." *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.,* 78 Ohio St.3d 353, 361, 678 N.E.2d 519 (1997). "Courts should attempt to harmonize provisions and words so that every word is given effect." *Christe v. GMS Mgt. Co.,* 124 Ohio App.3d 84, 88, 705 N.E.2d 691 (9th Dist.1997).

**{¶40}** The KSU-Ford employment agreement is unambiguous. Upon reading the KSU-Ford employment contract as a whole, the "essence of the agreement" was for Ford to remain as KSU's coach for the entire five-year period. KSU and Ford agreed to a reciprocal liquidated damages clause. As stated, we have already upheld this provision in the prior appeal. And although the KSU-Ford agreement anticipates a breach, and spells out damages upon either party's breach, it does not authorize or permit a breach, contrary to Bradley's assertion.

10

**{¶41}** While Ford and KSU contemplated requiring Ford's successor employer to pay the liquidated damages on his behalf, the KSU-Ford agreement is not binding on Bradley since it was not a party. *Raber v. Emeritus at Marietta,* 4th Dist. Washington No. 15CA18, 2016-Ohio-1531, 49 N.E.3d 345, ¶20.

**{¶42}** Moreover, KSU was contractually obligated to allow Ford to interview elsewhere within certain parameters. However, a plain reading of the KSU-Ford agreement does not show that KSU's granting permission to Ford to interview constitutes a grant of permission to terminate the contract and walk away from his remaining years as KSU's coach.

**{¶43}** Upon courting Ford to become Bradley's head basketball coach, Bradley was aware that Ford was already under contract with KSU. Michael Cross, Bradley's athletic director, testified that he knew Ford was under contract with KSU, but was under the belief that he had "a way out of his contract." Cross knew Ford had KSU's permission to speak with Bradley, but did not know the contents of the Ford-KSU agreement. Cross stated that all head college basketball coaches have contracts.

**{¶44}** Joanne Glasser, Bradley's president, was also aware that Ford was under contract with KSU as its head men's basketball coach at the time he was interviewed for Bradley's head coaching position. Bradley retained Dan Parker and Associates to search for Bradley's new coach, but Glasser explained that she and Cross made the decision to hire him and provided Parker with the terms of the offer eventually extended to Ford.

**{¶45}** Glasser also confirmed that Bradley obtained KSU's permission to interview Ford, but that Bradley did not secure KSU's consent to hire him, stating that she did not believe she needed its consent to hire Ford since Bradley had complied with the requisite

11

protocol in interviewing him. Glasser recalls Cross negotiating with KSU's athletic director about Ford's "buyout," and explained that athletic directors usually deal directly with one another in these situations and that she was not directly involved.[1]

{¶46} KSU's athletic director, Joel Nielson, testified that there were rumors about other universities' interest in Ford because of his successes at KSU. Ford was asked to let KSU know of his intent to leave so his departure would not surprise the KSU staff. Ford's representative, Rick Giles, contacted Nielson to seek permission for Ford to interview with Bradley. Nielson gave Ford KSU's consent to interview, but not until after the end of their basketball season.

{¶47} On March 26, 2011, Ford and Nielson spoke a few times about Ford's potential offer with Bradley and the liquidated damages clause in his KSU contract. Ford wanted to know what KSU's president's position would be on this damages clause, and Nielson recalls telling him that KSU would not waive it. At one point in their conversations, Ford told Nielson that he may not be able to take the Bradley job if KSU was enforcing this contract provision because he could not afford the "buyout." Ford eventually called Nielson back to let him know that he was taking the Bradley offer.

{¶48} Nielson also spoke with Bradley's athletic director Cross that same day, and Cross advised that Ford was one of five candidates for the Bradley head coaching opportunity. Toward the end of their call, Nielson told Cross about Ford's contract provision with the "buyout" of "[f]our years at base salary." Neilson testified, "I stated the amount, and I * * * remember the  - - the reply very succinctly, the reply was, 'That's between you and the Coach.'"

_____

1. Ford's KSU contract contains a liquidated damages clause; there was not a buyout. However, we use the parties' language referencing the clause as a "buyout" for ease of discussion.

12

{¶49} Nielson relayed the message to KSU president, Lester Lefton, who was disappointed about losing its successful basketball coach. Nielson also told him that both Ford and Bradley were aware of the terms of Ford's "buyout."

{¶50} The Ford-Bradley employment agreement is memorialized in a memorandum of understanding offer (MOU). Ford and Bradley executed the MOU on March 26, 2011 with an effective date of March 27, 2011. Ford and Bradley did not enter into a formal employment agreement in light of the pending threat of litigation by KSU. The MOU states in part:

{¶51} "The University will pay up to $300,000 $400,000 of the buyout owed to your current institution. The University will make a good faith attempt to minimize tax liability to the coach but the coach will ultimately be responsible for all personal tax obligations."

{¶52} The $300,000 typewritten amount is crossed out and $400,000 is handwritten.

{¶53} A review of the Section 767 factors does not support the trial court's decision granting summary judgment to Bradley as a matter of law. Instead, as argued by KSU, a close examination of the factors and circumstances shows a genuine issue of fact remains. This is not the easy case in which physical violence, fraud, or threats of physical violence were employed to secure the breach thereby making a finding of improper interference as a matter of law. In fact, the trial court previously granted summary judgment in KSU's favor before it voluntarily dismissed its case.

{¶54} "The issue in each case is whether the interference is improper or not under the circumstances; whether, upon a consideration of the relative significance of the

factors involved, the conduct should be permitted without liability, despite its effect of harm to another."  Restatement (Second) of Torts §767 (1979), *Comments.*

{¶55}  Upon considering lack of proper justification, a jury could reasonably infer the following:

{¶56}  As for factor *(a) the nature of the actor's conduct*, the comment on this factor notes that this is a chief factor in determining whether the conduct is improper and notes in part that a proper consideration includes whether the interferor violated established customs, practices, or recognized ethical codes in a particular business or industry. Bradley, with knowledge that Ford was under contract, solicited him to become its head coach while Ford was still engaged as KSU's coach.

{¶57}  As for *(b) the actor's motive,* Bradley sought to advance its men's basketball program upon hiring KSU's successful coach.  As for *(c) the interests of the other with which the actor's conduct interferes,* although KSU and Bradley are not rival schools nor are they even in the same conference, Ford could not simultaneously coach for KSU in Ohio and Bradley in Illinois.  As for factor *(d) the interests sought to be advanced by the actor,* the comment on this section notes that although one's intent to further its economic interest is important, if the competitor's interest "has been already consolidated into the binding legal obligation of a contract, however, that interest will normally outweigh the [interferor's] own interest in taking that established right from him."  Here, Bradley sought to further its own university's interests to have a better team, better publicity, and bigger crowds and ticket sales.

**{¶58}** And as for *(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other*, Bradley did not protect or promote freedom of contract by soliciting KSU's coach from his existing four-year agreement.

**{¶59}** As for *(f) the proximity or remoteness of the actor's conduct to the interference*, the Restatement comment on this factor states: "One who induces a third person not to perform his contract with another interferes directly with the other's contractual relation. The interference is an immediate consequence of the conduct, and the other factors need not play as important role in the determination that the actor's interference was improper. The actor's conduct need not be predatory or independently tortious, for example, and mere knowledge that this consequence is substantially certain to result may be sufficient." There is an inference that can be drawn that Bradley's offer of employment, including more than double Ford's annual salary at KSU, proximately caused Ford's breach of his employment agreement with KSU. Finally, as for *(g) the relations between the parties,* there were no prior relations between KSU and Bradley.

**{¶60}** The final comment to Restatement 767 discusses the function of the judge and jury and states in part that "when there is room for different views, the determination of whether the interference was improper or not is ordinarily left to the jury, to obtain its common feel for the state of community mores and for the manner in which they would operate upon the facts in question."

**{¶61}** Upon offering Ford its head coaching position, Bradley sought to improve its basketball program and advance its own economic interests. In doing so, it disregarded Ford's existing employment agreement and successfully got him to breach his remaining commitment to KSU.

15

**{¶62}** The MOU offers to pay up to $400,000 toward Ford's "buyout" of his breach of his KSU employment agreement. Ford explained in his deposition that this amount was never paid to KSU by Bradley because the provision was designed to assist him in settling KSU's breach of contract claim against him. And because Ford's settlement offer to KSU fell through, Bradley never paid $400,000 toward Ford's "buyout."

**{¶63}** Bradley claims there is nothing in the Ford-KSU agreement requiring it to get consent to hire him. Bradley also claims that its interference was not improper because Ford's contract permitted him to walk away from his KSU contract upon paying liquidated damages. Finally, Bradley claims it did not act improperly because KSU's grant of permission to interview was the equivalent of its consent to Ford's breach.

**{¶64}** KSU president Lefton explained that allowing a coach to interview with another university interview is a courtesy, but that it does not reflect that a college is letting its coach out of his or her contract.

**{¶65}** In a comparable case, Coach Gerry DiNardo argued that Vanderbilt University waived its right to enforce its liquid damages clause against him because it granted him permission to interview with his subsequent employer, Louisiana State University. *Vanderbilt Univ. v. DiNardo,* 174 F.3d 751, 757 (6th Cir.1999). In rejecting Dinardo's waiver argument, the Sixth Circuit Court of Appeals held that a grant of permission to talk to another university is not permission to breach the existing employment contract. Instead, the "permission to talk" clause in coaching agreements is a professional courtesy reflecting that the parties contemplated the coach exploring other coaching positions and even leaving the university. *Id.*

16

{¶66} KSU and Ford's inclusion of a provision allowing Ford to interview elsewhere and providing KSU with notice of his potential exit, should not be construed as KSU foregoing its remaining rights under the employment agreement. This argument runs contrary to the requirement that contracts should be read as a whole, and that the provisions should be construed in harmony with one another.

{¶67} As Bradley argues, KSU could have conditioned its consent to Ford interviewing upon Bradley agreeing to pay the liquidated damages.

{¶68} Based on the foregoing, the trial court's decision granting summary judgment in Bradley's favor on this claim was erroneous. Upon construing the evidence most strongly in KSU's favor, reasonable minds may draw different inferences, or reach different conclusions, and as such, a jury question exists. *Hamden Lodge No. 517, I.O.O.F. v. Ohio Fuel Gas Co.,* 127 Ohio St. 469, 482, 189 N.E. 246 (1934); *Howard v. Pennsylvania R. Co.,* 43 Ohio App. 96, 99, 182 N.E. 663, 664, 8 Ohio Law Abs. 445 (6th Dist.1930) (finding directed verdict in error where facts warrant an inference that defendant was negligent); *Long v. Equitable Life Assur. Soc. of U.S.,* 75 Ohio App. 277, 60 N.E.2d 805 (1st Dist.1945), paragraph four of the syllabus ("Even where the facts are not disputed, if different inferences could be drawn by reasonable minds from such facts, the question still presents a factual issue."); *Franklin v. Schreyer*, 174 N.E.2d 132, 135 (10th Dist.1960) (reversing and remanding directed verdict because evidence allowed jury to make an inference in plaintiff's favor). Thus, the issue remains as to whether Bradley lacked a proper justification in procuring Ford's breach of his employment agreement with KSU.

{¶69} As for the fifth and final element, damages, a plaintiff may recover all damages proximately caused by the tortfeasor's misconduct. *Akron-Canton Waste Oil, Inc. v. Safety-Kleen Oil Serv., Inc.*, 81 Ohio App.3d 591, 599, 611 N.E.2d 955 (9th Dist.1992).

{¶70} KSU claims it is entitled to its loss of the benefit of the bargain, i.e., it claims that because it had Ford under contract for four more years at $300,000 annually and Bradley hired him for $700,000 per year, KSU lost the $400,000 per year benefit of its employment agreement with Ford. KSU also claims to have incurred expenses associated with hiring a new head basketball coach, including hiring a search firm, travel to and from interviews, the KSU staffing time devoted to searching for a new coach, loss of fundraising, and a loss of equity and good will that Ford had in the surrounding community. It did not, however, establish these damages with specificity sufficient for a grant of summary judgment.

{¶71} In assessing the extent of permissible damages under a tortious interference with contract claim, several Ohio courts of appeals have adopted Restatement of the Law 2d, Torts (1979) 54, Section 774A(1) to quantify damages. *Scanlon v. Gordon F. Stofer & Bros., Co.,* 8th Dist. Cuyahoga No. 55467, 1989 WL 69400, *18; *Gray-Jones v. Energy Marketing Services, Inc.,* 137 Ohio App.3d 93, 738 N.E.2d 64 (10th Dist.2000); *Morrison v. Renner*, 5th Dist. Muskingum No. CT2011-0010, 2011-Ohio-6780, ¶27-32. Section 774A states:

{¶72} "(1) One who is liable to another for interference with a contract or a prospective contractual relation is liable for damages for

18

**{¶73}** "(a) the pecuniary loss of the benefits of the contract or the prospective relation;

**{¶74}** "(b) consequential losses for which the interference is a legal cause; and

**{¶75}** "(c) emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference."

**{¶76}** "(2) In an action for interference with a contract by inducing or causing a third person to break the contract with the other, the fact that the third person is liable for the breach does not affect the amount of damages awardable against the actor; but any damages in fact paid by the third person will reduce the damages actually recoverable on the judgment."

**{¶77}** The Twelfth District Court of Appeals recently explained the scope of damages and interplay between a breach of contract claim and an intentional interference with contract claim consistent with Section 774A. We agree with the law as set forth in *Ginn v. Stonecreek Dental Care*, 12th Dist. Fayette No. CA2016-10-014, 2017-Ohio-4370, ¶16, on this issue:

**{¶78}** "A plaintiff asserting tortious interference with contract may, upon competent proof, recover any damages proximately caused by the tortfeasor's misconduct. *Davison Fuel & Dock Co. v. Pickands Mather & Co.*, 54 Ohio App.2d 177, 181, 376 N.E.2d 965 (1st Dist.1977). These damages may include, but are not limited to, damages otherwise recoverable in an action for breach of contract. *Id.* Accordingly, 'the mere existence of a plaintiff's inchoate cause of action against one party for breach of contract does not foreclose an action in tort against another party for all damages suffered by reason of the latter's inducement of such a breach.' *Id.* at 182, 376 N.E.2d 965.

19

However, 'the fact that a plaintiff has separate and independent causes of action in contract and in tort does not permit him to recover more than the amount of damage actually suffered as a consequence of the injury resulting from the wrongful breach of his contract.' *Id.* A plaintiff must 'allege and prove the existence of *additional* damages attributable' to the defendant to be awarded damages on each of the separate claims. (Emphasis sic.) *Id."*

{¶79} Here, the judgment against Ford for his breach of his employment agreement has been determined as a matter of law. However, the parties argue and the evidence shows that the judgment against him has not yet been fully satisfied. Thus, a genuine issue of fact exists as to what damages, if any, KSU can recover against Bradley based on its tortious interference claim. Accordingly, summary judgment on this element was improper as well.

{¶80} KSU's first assigned error has merit. Summary judgment in Bradley's favor was improper. The issues of whether the interference was proper and damages, if any, are remanded.

{¶81} KSU's second assigned error argues:

{¶82} "The trial court erred when it granted summary judgment against KSU on its indemnification claim under Section 914 of the Restatement of the Law, Torts (Second). Summary judgment instead should have been granted in KSU's favor on the issue of Bradley's liability."

{¶83} KSU's second assigned error claims the trial court erred in awarding Bradley summary judgment as to its "indemnification" claim, and that instead, it should

have granted summary judgment in KSU's favor and awarded it judgment as a matter of law. We agree, in part.

{¶84} Parties in Ohio are generally responsible for their own attorney fees. *Reagans v. MountainHigh Coachworks, Inc.,* 117 Ohio St.3d 22, 2008-Ohio-271, 881 N.E.2d, 245, ¶36. However, several Ohio courts have recognized an independent tort that is the exception to this rule. *Reiner v. Kelley,* 8 Ohio App.3d 390, 395, 4577 N.E.2d 946 (10th Dist.1983) (citing Restatement (Second) of Torts § 914 (1979); *Werner v. Primax Recoveries, Inc.,* N.D.Ohio No. 3:07CV2430, 2008 WL 4159431, *3, *aff'd*, 365 Fed.Appx. 664 (6th Cir.2010). Restatement of the Law 2d, Torts (1965), Section 914(2) *Expense of Litigation* states:

{¶85} "One who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover reasonable compensation for loss of time, attorney fees and other expenditures thereby suffered or incurred in the earlier action."

{¶86} Here, KSU claims it was "required" to bring its breach of contract claim against Ford based on Bradley's inducement of Ford to breach his contract, and absent Bradley's tortious interference, KSU would not have incurred extensive attorney fees and expenses prosecuting its breach of contract claim against Ford and defending against his appeals to this court and the Ohio Supreme Court. In support, KSU points to Bradley's promise set forth in the MOU in which it promises to pay $400,000 toward Ford's buyout of his existing employment contract.

{¶87} As evidence that Bradley incentivized Ford to appeal, KSU points out that Bradley paid Ford's attorney fees in excess of $100,000 incurred in his pursuit of his

21

appeals from the liquidated damages award against him from this promised sum of $400,000. Further Ford states in his deposition testimony that he did not ask Bradley to pay his attorney fees, but that Bradley offered to fund his appeals after judgment was rendered against him in KSU's favor.

{¶88} In *Reiner v. Kelley*, 8 Ohio App.3d 390, 457 N.E.2d 946 (10th Dist.1983), attorney Kelley was found liable for fraud based on the misuse of funds entrusted to him. His partner, Keller, who was innocent and had not engaged in fraud, was also held liable. Keller cross-claimed for attorney's fees against Kelley, which the trial court denied. On appeal, however, the Tenth District reversed in part and applied Section 914 of the Restatement (Second) of Torts. It held that Keller was entitled to reasonable attorney's fees because his liability was incurred exclusively as a result of his partner's fraud. *Id.* at 395.

{¶89} In opposition, Bradley claims that even if it is found to have induced Ford to breach his contract, Ford independently chose not to pay the liquidated damages clause, forcing KSU to file suit against him.

{¶90} This is not the simple case where an individual was forced to defend an action against him based on the criminal or fraudulent conduct of another as in *Reiner*. Instead, if the trier of fact finds that Bradley "tortiously" interfered with the KSU-Ford employment agreement, the trier of fact must consider on remand whether Bradley's payment of Ford's appellate attorney fees "required" KSU to protect its interest through defending Ford's appeals from the judgment against him consistent with Section 914(2). If it finds that KSU had no choice but to pursue its claims in court and defend appeals

based on Bradley's tort, as KSU alleges, then the jury may conclude that KSU is entitled to its litigation expenses incurred, resulting from Bradley's tortious conduct.

**{¶91}** Accordingly, genuine issues of fact remain, and judgment as a matter of law was not warranted in either party's favor on this claim. KSU's second assigned error has merit in part.

**{¶92}** KSU's third assigned error claims:

**{¶93}** "The trial court erred when it granted summary judgment against KSU on the third-party beneficiary contract claim. Summary judgment instead should have been granted in KSU's favor."

**{¶94}** As stated, in March of 2011, Ford sought and was granted permission by KSU's athletic director to interview with Bradley. Ford was ultimately offered Bradley's head basketball coaching position, and the two entered into a written agreement, the MOU. The MOU was negotiated and agreed upon in Illinois and was to be performed in Illinois. Because the MOU does not include a choice of law provision, Illinois law governs its interpretation. *Montana Coal & Coke Co. v. Cincinnati Coal & Coke Co.*, 69 Ohio St. 351, 69 N.E. 613, (1904) paragraph one of the syllabus; *Schulke Radio Productions, Ltd. v. Midwestern Broadcasting Co.,* 6 Ohio St.3d 436, 438, 453 N.E.2d 683 (1983).

**{¶95}** Ford explained that his agent Rick Giles negotiated with Bradley's president at the time, Glasser, before he signed the MOU. The MOU reflects that Bradley agreed to pay $400,000 toward Ford's "buyout" of his KSU contract. Ford said at his deposition that this $400,000, however, was never paid to KSU because it declined his offer to buy out or settle his liquid damages. And instead, KSU wanted the full amount as stated in Ford's employment agreement.

23

**{¶96}** The MOU states that it is an offer of employment to Ford on behalf of Bradley University. It makes no direct mention of KSU. The provision in issue states:

**{¶97}** "The University will pay up to ~~$300,000~~ $400,000 of the buyout owed to your current institution. The University will make a good faith attempt to minimize tax liability to the coach but the coach will ultimately be responsible for all personal tax obligations."

**{¶98}** Ford advised KSU of his intent to leave, and KSU athletic director Nielson attempted to get KSU to agree to accept $600,000 instead of the amount due under the liquid damages clause set forth in 7a. KSU's president, however, did not want to settle with Ford and insisted on payment in full.

**{¶99}** KSU now claims it is a third-party beneficiary entitled to enforce this $400,000 provision in the MOU and entitled to bring a claim for breach of that agreement. Bradley argues that KSU was an incidental beneficiary who had no right to the money. The trial court agreed with Bradley and entered summary judgment in its favor on this claim.

**{¶100}** To determine whether contracting parties intended to benefit a nonparty to the agreement, courts look at the terms of the contract and the circumstances surrounding the parties at the time of the execution of the agreement. *Advanced Concepts Chicago, Inc. v. CDW Corp.*, 405 Ill.App.3d 289, 293, 938 N.E.2d 577 (2010).

**{¶101}** Under Illinois law, a direct third-party beneficiary is one whom the parties intended to directly benefit from the contract. *Cahill v. Eastern Benefit Systems, Inc.*, 236 Ill.App.3d 517, 520, 177 Ill.Dec. 718, 603 N.E.2d 788 (1992).

**{¶102}** "On the other hand, an incidental third-party beneficiary is one who receives an unintended benefit from a contract. *Caswell v. Zoya International, Inc.*, 274 Ill.App.3d

24

1072, 1074-75, 211 Ill.Dec. 90, 654 N.E.2d 552 (1995). Only an intended third-party beneficiary may enforce rights under a contract. *XL Disposal Corp. v. John Sexton Contractors Co.,* 168 Ill.2d 355, 361, 213 Ill.Dec. 665, 659 N.E.2d 1312 (1995). The operative question is whether the parties to the contract intended to confer a *direct* benefit on the purported third-party beneficiary. *Gallagher Corp. v. Russ,* 309 Ill.App.3d 192, 200, 242 Ill.Dec. 326, 721 N.E.2d 605 (1999). A strong presumption exists that parties intend a contract to apply solely to themselves. *Martis v. Grinnell Mutual Reinsurance Co.,* 388 Ill.App.3d 1017, 1020, 329 Ill.Dec. 82, 905 N.E.2d 920 (2009). That the parties expect, know, or even intend that the contract benefit others is insufficient to overcome the presumption that the contract was intended only for the parties'' *direct* benefit. *Id.; Barney v. Unity Paving, Inc.,* 266 Ill.App.3d 13, 19, 203 Ill.Dec. 272, 639 N.E.2d 592 (1994)." (Emphasis sic.) *Bank of America Nat. Assn. v. Bassman FBT, L.L.C.,* 2012 IL App (2d) 110729, 981 N.E.2d 1, ¶ 27 (Ill.App.), *as modified on denial of reh'g* (Dec. 7, 2012).

{¶103} In *Metro Jet Cab Assn. Inc. v. Passdroid LLC,* 2017 IL App (1st) 153670-U, the Illinois appellate court found that Metro Jet was an intended third-party beneficiary with rights to enforce the contract. There, a review of the contract language showed that "the contracting parties entered into the agreement intending to directly benefit Metro Jet because the agreement continued and upgraded services that Metro Jet had been receiving under" a prior agreement. *Id.* at ¶23. Further, the testimony showed that after the prior agreement was terminated, the parties contemplated an agreement between Metro Jet and Passdroid. However, Passdroid did not believe that Metro Jet had sufficient assets. Metro Jet's sister company, with sufficient assets, entered into the service

25

agreement on Metro Jet's behalf. Pursuant to the contractual language, the services were still to be provided to Metro Jet even though it was not a party to the agreement. *Id.* at ¶6-7. Thus, Metro Jet was an intended third-party beneficiary with rights of enforcement.

{¶104} Upon construing the evidence in a light most favorable to KSU, the $400,000 buyout provision in Ford's MOU was designed to benefit Ford either as an amount paid toward a settlement offer to KSU or an amount toward paying off Ford's liquidated damages as set forth in Ford's KSU employment agreement. Under either scenario, the benefit to KSU was incidental; it was not a party to the MOU, and the benefit to KSU was to arise via Bradley's and Ford's direct intent to further their own positions, not to benefit KSU. There is no evidence to the contrary.

{¶105} Unlike *Metro Jet*, the evidence here does not show that KSU is an intended third-party beneficiary of the Bradley-Ford MOU. Accordingly, upon construing the evidence against Bradley, no genuine issue of material fact exists, and judgment is appropriate in Bradley's favor on this claim as a matter of law. We affirm the trial court's decision awarding Bradley summary judgment on KSU's third-party beneficiary claim.

{¶106} KSU's fourth assigned error alleges:

{¶107} "The trial court abused its discretion in denying KSU's motion to amend the complaint to conform to the evidence."

{¶108} KSU challenges the trial court's decision denying its motion to amend its complaint to conform to the evidence. It claims that it did not seek to add new claims to its complaint, but only additional facts in support of its existing civil conspiracy and fraudulent conveyance claims against Bradley and Ford.

26

{¶109} Civ.R. 15 governs a motion for leave to amend the pleadings, and we review the trial court's decision for an abuse of discretion. *Merrill Lynch Mtge. Lending, Inc. v. 1867 W. Mkt., L.L.C.,* 9th Dist. Summit No. 23443, 2007-Ohio-2198, ¶8.

{¶110} An abuse of discretion is a term of art reflecting a court's exercise of judgment that fails to comport with the record or logic. *Ivancic v. Enos*, 11th Dist. Lake No. 2011-L-050, 2012-Ohio-3639, 978 N.E.2d 927, ¶70. An abuse of discretion has also been aptly described as the trial court's "'failure to exercise sound, reasonable, and legal decision-making.'" *Id.* quoting *State v. Beechler,* 2d Dist. No. 09–CA–54, 2010-Ohio-1900, 2010 WL 1731784, ¶62, quoting Black's Law Dictionary (8 Ed.Rev.2004) 11.

{¶111} Here, KSU moved to amend its complaint under Civ.R. 15(B). However, when there has been no trial, the use of Civ.R. 15(B) to amend the pleadings is improper since it is only applicable where there has been a trial. *Thomas v. Reserves Network*, 9th Dist. Lorain No. 10CA009886, 2011-Ohio-5857, ¶8, citing *Merrill Lynch Mtge. Lending, Inc. v. 1867 West Market, L.L.C.,* 9th Dist. No. 23443, 2007-Ohio-2198, ¶11.

{¶112} Instead, pretrial amendments to the pleadings are governed by Civ.R. 15(A), which states in part:

{¶113} "A party may amend its pleading once as a matter of course within twenty-eight days after serving it or, if the pleading is one to which a responsive pleading is required within twenty-eight days after service of a responsive pleading or twenty-eight days after service of a motion under Civ.R. 12(B), (E), or (F), whichever is earlier. In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court shall freely give leave when justice so requires."

27

{¶114} KSU claims it was delayed in asserting its updated fraudulent transfer and civil conspiracy claims because Bradley refused to comply with its discovery requests and that KSU only learned about this additional factual basis once the trial court ordered Bradley to produce the requested discovery.

{¶115} As alleged, the trial court denied KSU's motion to amend its complaint to conform to the evidence. Because KSU did not seek leave under Civ.R. 15(A) or have the other parties' consent, however, and because its motion was filed well after the time limit set forth in Civ.R. 15(A) for amending pleadings without leave of court, KSU has failed to show the trial court abused its discretion.

{¶116} Notwithstanding the trial court's denial of KSU's motion to amend, the trial court's decision granting Bradley summary judgment reflects that it nevertheless addressed the factual basis for its request, i.e., KSU's claim that Bradley transferred funds from the $400,000 owed to Ford for his buyout to a law firm to pay for his prior appeals. The trial court found in part that "there was no transfer of money from the $400,000 to pay Defendant Gene Ford's attorney's fees; therefore, there was no Fraudulent Transfer."

{¶117} Thus, even assuming the trial court should have construed KSU's motion as seeking leave to amend its complaint under Civ.R. 15(B), there was no resulting prejudice because it considered the factual basis for KSU's amended claims. Finding no abuse of discretion, KSU's fourth assigned error lacks merit and is overruled.

{¶118} KSU's fifth and final assigned error asserts:

{¶119} "The trial court erred when it granted summary judgment on KSU's fraudulent conveyance claim, and derivatively, its civil conspiracy claim."

**{¶120}** KSU's fourth and fifth causes of action, fraudulent transfer and civil conspiracy, were asserted against both Bradley and Ford, and the trial court awarded summary judgment to both on these claims, which we review de novo.  Civ.R. 56(C).

**{¶121}** The fraudulent transfer statute relied on by KSU, R.C. 1336.04(A), states:

**{¶122}** "A transfer made * * * is fraudulent as to a creditor, whether the claim of the creditor arose before, or within a reasonable time not to exceed four years after, the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation in either of the following ways:

**{¶123}** "(1) With actual intent to hinder, delay, or defraud any creditor of the debtor * * *."

**{¶124}** Whereas a civil conspiracy is,

**{¶125}** "'a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages.'" * * *

**{¶126}** "An underlying unlawful act is required before a civil conspiracy claim can succeed. * * * The malice involved in the tort is 'that state of mind under which a person does a wrongful act purposely, without a reasonable or lawful excuse, to the injury of another.' * * *" *Williams v. Aetna Fin. Co.,* 83 Ohio St.3d 464, 475, 700 N.E.2d 859 (1998).

**{¶127}** KSU raises two bases supporting its fraudulent conveyance and civil conspiracy claims.  First, KSU alleges it was a third-party beneficiary of the Ford-Bradley MOU.  Thus, it claims that Bradley's transfer of more than $100,000 to lawyers representing Ford and pursuing his prior appeals from the $400,000 "earmarked" in the

29

MOU to pay KSU, was fraudulently transferred by Bradley in violation of R.C. 1336.04(A). KSU claims that this "transfer" to the attorneys was designed to avoid paying it, as a third-party beneficiary under the MOU.

{¶128} KSU also alleges that this fraudulent transfer to Ford's appellate attorneys constitutes an unlawful act establishing a civil conspiracy between Ford and Bradley designed to prevent KSU from acquiring the $400,000 under the MOU. Both of these claims hinge on the viability of KSU's third-party beneficiary status with a right to enforce the $400,000 buyout provision. Because KSU's third-party beneficiary claim lacks merit as a matter of law, however, its first basis for its fraudulent conveyance and civil conspiracy claims likewise fails as a matter of law.

{¶129} Second, KSU contends that Bradley's staggered monthly payments to Ford after his termination from Bradley were designed to evade KSU's garnishment efforts against him and that Bradley's payments in this manner show an intent to defraud KSU, as Ford's creditor. Thus, KSU claims that this establishes its fraudulent conveyance and civil conspiracy claims.

{¶130} In its motion for summary judgment, Bradley points to Ford's testimony in which he confirms that he was not entitled to a lump sum payment under the MOU upon his termination from Bradley. Instead, Bradley continued to pay Ford monthly as it had from the inception of his employment with Bradley. Ford likewise testified that he did not request or expect Bradley to make his severance payment in a lump sum payment.

{¶131} Further, nothing in the Bradley-Ford MOU reflects that Ford was entitled to a lump sum payment upon Bradley's termination of Ford's employment. KSU fails to point to any evidence to the contrary, and its speculative theory is insufficient to overcome

30

Bradley's summary judgment evidence. *Cerimele v. Vanburen,* 7th Dist. Mahoning No. 11MA159, 2013-Ohio-1277, ¶26.

{¶132} Because KSU fails to show that a genuine issue of fact remains for trial, summary judgment was appropriate on its fraudulent transfer and civil conspiracy claims as a matter of law. Accordingly, KSU's fifth assigned error lacks merit.

{¶133} In summary, KSU's first and second assigned errors have merit in part, and its third, fourth, and fifth assigned errors lack merit. We affirm in part, reverse in part, and remand for further proceedings.

MATT LYNCH, J., concurs.

TIMOTHY P. CANNON, J., concurs in part and dissents in part, with a Concurring/Dissenting Opinion.

_____

TIMOTHY P. CANNON, J., concurring in part and dissenting in part.

{¶134} I dissent with regard to the first and second assignments of error, as summary judgment was appropriate on all of KSU's claims and should be affirmed. Quite simply, Bradley University did nothing wrong. I concur with the balance of the majority opinion.

{¶135} The Supreme Court of Ohio formally recognized the existence of tortious interference with a contract in *Kenty v. Transamerica Premium Ins. Co.*, 72 Ohio St.3d 415 (1995). To recover under this tort, a plaintiff must prove all of the following elements: (1) the existence of a contract, (2) the defendant's knowledge that a contract existed, (3) *the defendant's intentional procurement to breach that contract*, (4) *the defendant's lack*

*of justification for the procurement to breach the contract*, and (5) the damages that resulted from the breach. *Id.*, at paragraph two of the syllabus (emphasis added).

{¶136} Even though Bradley was not a party to the contract between KSU and Ford, it was clearly aware of certain provisions of that agreement. In the contract, KSU and Ford specifically addressed the possibility of Ford leaving to coach somewhere else prior to the conclusion of the five-year contract term. It detailed the fact Ford would not seek or accept a job with another MAC school "during this agreement." If, on the other hand, Ford was sought for a job prospect outside of the MAC, the parties agreed that Ford would not respond to such an inquiry "without the permission of the Director, with such permission not to be unreasonably withheld." That is exactly what happened here.

{¶137} Bradley did, in fact, seek and receive permission to talk to Ford. KSU does not deny it gave Bradley permission to talk to Ford, with the caveat that the talks not take place until after the season. This request was honored by Bradley. In deposition testimony, KSU's president claims giving this permission was a "courtesy" to other universities. However, based on the obligation to "not unreasonably" withhold its consent, it was anything but a courtesy. It was required under the contract.

{¶138} Any suggestion that Bradley's conduct was in violation of "established customs, practices, or recognized ethical codes in a particular business or industry" is not supported by the record. That Ford might leave was anticipated and accounted for in his contract with KSU. In the event Ford took another position, there was an agreed upon "termination" fee provided in the contract. It was not set forth as a penalty or fine for breach of the contract. In other words, Ford would breach the contract by failing to pay

32

the termination fee, not by leaving to coach for another school. There is no evidentiary material that suggests Bradley induced Ford not to pay the fee.

{¶139} There was likewise no "lack of justification" on the part of Bradley. It had the same non-malicious motive of every collegiate sports program operating across the country—to retain a successful head coach for a sports program where a vacancy exists. Seeking to fill a head coaching vacancy, with the permission of that coach's current employer, falls far short of establishing ill-intent.

{¶140} This is not a case where a university failed to ask permission and the record reflected an industry standard that would require such permission. It is also not a case where a university asked for permission and was denied, but talked to and offered Ford a contract anyway. Those scenarios could possibly present a factual question regarding improper motive or lack of proper justification. But under the circumstances at hand, no genuine issue of material fact exists as to whether Bradley lacked "proper justification." The trial court judgment in Bradley's favor on KSU's tortious interference with contract claim should be affirmed.

{¶141} Likewise, as KSU has failed to establish any genuine dispute of material fact with regard to its claim for tortious interference, its derivative claim for indemnification must fail as a matter of law because Bradley has committed no tort from which KSU could be required to act. The trial court judgment in Bradley's favor on KSU's indemnification claim for costs and expenses associated with the tortious interference claim should also be affirmed.